MINNESOTA MINING AND MANUFACTURING COMPANY, a corporation of Delaware, Plaintiff,

v.

BEWAL, INC., a corporation of Kansas, and Benjamine C. Edwards, Jr., Defendants.

Civ. A. No. W-1640.

United States District Court
D. Kansas.

April 27, 1960.

Haight, Lockwood & Simmons, Chicago, Ill., Carpenter, Abbott, Coulter & Kinney, St. Paul, Minn., Foulston, Siefkin, Schoeppel, Bartlett & Powers, by George B. Powers, Wichita, Kan., for plaintiff.

Cooper, Esco & Cooper, John H. Widdowson, Fleeson, Gooing, Coulson & Kitch, by Wayne Coulson, Wichita, Kan., for defendants.

RITTER, District Judge.

### Findings of Fact

1. The plaintiff, Minnesota Mining and Manufacturing Company (sometimes hereinafter called "Minnesota" and sometimes hereinafter called "plaintiff"), is a corporation organized and existing under and by virtue of the laws of the State of Delaware, and has its principal place of business at Saint Paul, Minnesota. The defendant, Bewal, Inc. (sometimes hereinafter called "Bewal") is a corporation of the State of Kansas, and has a regular and established place of business in Wichita, Kansas, within the District of Kansas. Bewal is a dealer in duplicating and lithographic supplies and equipment. The defendant Benjamine C. Edwards, Jr. is the President and General Manager, a director and a majority stockholder of the defendant Bewal, Inc.; and is a resident of the aforesaid district.

2. The jurisdiction of this Court is based on the fact that this is a suit in equity arising under the Patent Laws of the United States.

3. Minnesota is the sole and exclusive owner of the entire right, title and interest in and to the United States Letters Patent in suit, No. 2,714,066, entitled Planographic Printing Plate, granted by the Commissioner of Patents on July 26, 1955, to plaintiff as the assignee of Clifford L. Jewett and John M. Case, the joint inventors and joint applicants.

4. The claims in suit are claims 1 to 5 inclusive of the patent, which are all the claims of the patent. The patent is based upon an original application Serial No. 199,566, filed December 6, 1950, and upon a continuation-in-part thereof, Serial No. 450,149, filed August 16, 1954 (of which latter the application Serial No. 519,900, filed July 5, 1955, upon which the patent in suit issued, was a division). Claims 3, 4 and 5 of the patent are the same as the three claims which were allowed in the original application Serial No. 199,566, filed December 6, 1950, and which were covered by the notice of allowance dated October 29, 1954, in said original application. Claims 1 and 2 of the patent in suit are the same as claims 7 and 8 of said continuation-in-part application Serial No. 450,149.

5. The patent in suit has been, and is, the subject of other infringement litigation, including:

(a) Minnesota Mining and Manufacturing Co. v. A. B. Dick Company, Civil Action 55 C 1118, Northern District of Illinois, Eastern Division, commenced July 27, 1955, terminated by consent judgment entered April 14, 1958, holding the patent valid and infringed. Substantially concurrently a license was granted by Minnesota to A. B. Dick Company under said patent, under which A. B. Dick Company has paid substantial royalties.

(b) Minnesota Mining and Manufacturing Co. v. Harris-Intertype Corporation and Lithoplate, Inc., Civil Action No. 58 C 815, Northern District of Illinois, Eastern Division, commenced May 6, 1958, not as yet reached for trial.

(c) Minnesota Mining and Manufacturing Co. v. Polychrome Corporation et al., Civil Action No. 58 C 1445, Northern District of Illinois, Eastern Division, commenced August 1, 1958, not as yet reached for trial. Polychrome Corporation has agreed to pay, and is paying, defendants' costs of litigation herein, and has agreed to reimburse defendants for any judgment entered against them as a result of their sales of lithographic plates manufactured by Polychrome Corporation.

6. Planographic printing plates are used in lithography and are often called lithographic plates. Lithography is a process of printing from a plane surface

(i e. a surface without raised type or engraved images). It employs the principle that oil and water do not mix. A lithographic plate (planographic plate) has a printing image which repels water and accepts greasy ink. Non-printing background areas of such plates accept water and, when wet, repel greasy ink. In use in a typical application, the plate is mounted on a cylinder in a press. As the press operates the plate is successively dampened with a water solution, inked in the image areas with a greasy ink which is repelled by the dampened non-image areas, and then pressed against the rubber surface of an offset cylinder which removes the ink from the plate and, finally, transfers it to the paper.

7. In photolithography the plate is prepared by photographic means, i. e. the plate is light-sensitive and is exposed to light, such as ultraviolet light, through and in contact with a stencil or negative, whereupon the light-sensitive material becomes water-insoluble, hydrophobic and organophilic in the image areas, and remains water-soluble in the non-image areas, from which it is then washed away, to make the plate ready for the press. The image areas of the "picture" on the plate are ink receptive and the non-image areas are water receptive, so that the plate can be used on a standard lithographic press.

8. The conventional type of planographic plate in use for decades prior to the Jewett and Case invention was a grained zinc or aluminum plate, having a dull matte finish and the appearance and feel of having been sand-blasted, on which a light-sensitive coating of albumin and a bichromate such as ammonium bichromate was spread and dried. Such a plate had dimensional stability but had to be exposed and developed for use promptly after it was coated (ordinarily within 24 hours or less) because it tended to deteriorate rapidly at room temperature. In hot, humid weather the deterioration was particularly rapid.

9. Prior to the Jewett and Case invention, there were on the market pre-sensitized plastic plates and presensitized plastic laminated to paper. But such plates are not dimensionally stable and tend to stretch during use, with consequent distortion of image, making them unsuitable for high grade lithographic reproductions.

10. Prior to the Jewett and Case invention, the suggestion was made to laminate a film of cellulose acetate to the surface of aluminum, hydrolyze the exposed surface of the cellulose acetate film and then sensitize such surface with a diazo light-sensitive resin. Plates of this laminated structure, though earlier known, were not sold in this country until after the plate of the Jewett and Case invention was on the market. These laminated plates had drawbacks and defects, were distinctly inferior to the Jewett and Case presensitized metal plates of plaintiff, and soon went off the market.

11. The planographic printing plate of the Jewett and Case invention is a presensitized, dimensionally stable lithographic plate. By "presensitized" it is meant that, when the plate is ready for exposure through a stencil or negative, it may be shipped and stored in a light-proof package and then used weeks or months after manufacture, without further treatment, merely upon exposure to light through a stencil or negative, followed by washing of the unexposed light-sensitive material from the non-image areas of the plate. The plate's structure, more specifically set forth in the claims of the patent in suit, is a metal sheet, preferably aluminum, which is treated with a solution of silicate providing a permanently hydrophilic surface treatment on the metal sheet, which shields the diazo light-sensitive material from the deteriorating effect of the metal during shelf-life or storage, makes the plate run clean in the non-image areas following development, and provides a surface to which the light-reacted diazo image will adhere strongly to provide good press life; and, after the treated metal surface is freed of water-soluble alkali metal

material, it is then coated with a thin coating of a light-sensitive diazo resin.

12. Light-sensitive diazo resins were old in the art, prior to the Jewett and Case invention, having been disclosed in the Schmidt and Zahn U. S. Patent No. 2,063,631, granted December 8, 1936, on an application having an effective filing date of May 22, 1933, and in earlier disclosures. This patent was called to the attention of the Patent Office in the original Jewett and Case application Serial No. 199,566. Defendants' witness Van Dusen was aware of the fact that such diazo resins were available in Germany, through Kalle & Company, before World War II, i. e. prior to December, 1941. The use of light-sensitive diazo resins on lithographic plates had been proposed in the prior art, for example, in Kalle & Co. French patent No. 904,-255, published October 31, 1945, and in French patent No. 747,246, of December 9, 1932 (the latter being referred to in patent No. 904,255). However, the light-sensitive diazo resins, when coated on a metal surface, would deteriorate. The Kalle & Co. British patent No. 699,413, published November 4, 1953, acknowledges: "The light-sensitive layers of this kind on metallic supports have the disadvantage that they must be used shortly after their production, because it is impossible to store them in the unexposed state for a longer priod of time owing to the decomposition of the light-sensitive substance caused by the metal." Coating of the diazo light-sensitive resin on a plastic film and then laminating the film to a metal backing had been proposed; but this structure had defects and deficiencies, as hereinabove stated.

13. Jewett and Case were the first to produce a commercially acceptable presensitized metal lithographic plate. The materials used in its manufacture were all old. The diazo light-sensitive resin had been known for upwards of 15 years before the Jewett and Case invention. Sheets of aluminum and solutions of alkali metal silicate were much older. All were available to anyone who might have conceived of the presensitized metal lithographic plate defined in the claims of the patent in suit. No one had combined them to produce a successful plate until Jewett and Case did so; and no one had produced and offered commercially a presensitized metal plate, by any means or method, prior to the presensitized metal plate of plaintiff, made according to the Jewett and Case invention, and first sold in August, 1950.

14. A ready market for the lithographic plate defined in the claims of the patent in suit existed for a great many years before 1950, the year of the Jewett and Case invention, and certainly for as long as grained zinc albumin-bichromate plates had been used.

15. It was not the want of materials nor the want of a market which delayed the appearance of the presensitized metal lithographic plate of the claims of the patent in suit.

16. Although defendants originally relied upon more than thirty prior art patents and publications, at the pretrial on January 30, 1960, defendants restricted the prior patents and publications, to be relied upon by them at the trial, to the following:

| U. S. patent No. | 1,540,766 | Daniels et al. | June | 9, 1925 |
|---|---|---|---|---|
| U. S. " " | 1,946,153 | Edwards | Feb. | 6, 1934 |
| U. S. " " | 2,225,736 | Champion | Dec. | 24, 1940 |
| U. S. " " | 2,507,314 | Mason | May | 9, 1950 |
| French patent No. | 904,255 | Kalle & Co. | Feb. | 19, 1945 |
| German " " | 464,051 | Tutzschke | Aug. | 4, 1928 |
| Canadian " " | 427,626 | Mason | May | 22, 1945 |
| British " " | 407,830 | Siemens | Mar. | 29, 1933 |
| British " " | 433,538 | Siemens | Aug. | 12, 1935 |

Report 4116, Dept. of Commerce, CIO, Report No. C–4, published July 7, 1945, entitled "Report on Diazo Processes Developed by Kalle and Co., A.G. J.I.O.A."

Final Report No. 13, report prepared by J.I.O.A., Washington, D. C. Report No. C–1 published June 17, 1945.

"Mitteilungen des Forschungsinstituts und Profieramts fur Edelmetalle an der staatlichen Hohern Fachschule Schwabisch Gmund 12, 1–9, 17–29 (1938)".

Clerc publication cited by the U. S. Patent Office in file wrappers of the Jewett and Case patent.

"Lithography as Found in Germany", article in December 1946 issue of Modern Lithography.

Ad by Kalle & Co. in "Der Polygraf", May 20, 1948 issue, page 59.

The defendants, at the trial, placed primary reliance upon the Kalle French patent No. 904,255, the Mason Canadian patent No. 427,626, and certain other United States and foreign patents.

17. The Kalle & Co. French patent No. 904,255, published October 31, 1945, shows an attempt to make a lithographic plate by coating a water-soluble light-sensitive diazo resin (without the use of colloids, such as albumin) over a metal sheet such as aluminum, or over a porous layer on the surface of the aluminum sheet, consisting of aluminum compounds of oxygen, fluorine or phosphorus. This approach did not yield any kind of a plate which has had any commercial acceptance in this country. It has not been shown that it ever had any commercial acceptance anywhere. Kalle & Company itself acknowledged (in its British patent No. 699,413, of November 4, 1953, aforesaid) the defects and drawbacks of putting the diazo directly on metallic supports, with or without a porous coating on the metal; and defendants' expert's opinions and findings were not inconsistent therewith.

18. The Mason Canadian patent No. 427,626, of May 22, 1945, relates to an aluminum sheet having a printing surface which has been chemically prepared, by repeated etches with a fluoride, to give a deeply grained plate. This chemical preparation, Mason says, may preferably be that described and claimed in another Canadian application, Serial No. 507,111. This chemical preparation is likewise disclosed in the Mason U. S. patent No. 2,507,314, considered by the Patent Office during the examination of the Jewett and Case application for the patent in suit. The deeply grained plate may be treated with a silicate and coated with a sensitized albumin or used as a "deep etched plate". Mason does not mention a diazo light-sensitive resin, nor suggest the idea of a presensitized lithographic plate. The documentary exhibits identified by the witness Milton Roth, of Aluminum Company of America, show that the same Ralph B. Mason named in the patents, an employee of Aluminum Company of America, and Aluminum Company of America were trying to assist, first A. B. Dick Company, beginning in December 1951, and thereafter Harris-Intertype Corp., Lithoplate, Inc. and Polychrome Corporation, to make a presensitized metal lithographic plate, and encountered many difficulties, extending over many months, even though they had samples of plaintiff's presensitized metal lithographic plate before them, which had been sold commercially for many months prior thereto. By 1954 Aluminum Company and others became familiar with the disclosure of the Jewett and Case invention through the publication of applications in foreign countries, particularly in Great Britain and Australia, which were the foreign counterparts of the aforesaid original Jewett and Case U. S. application Serial No. 199,566, filed December 6, 1950.

19. The Mason U. S. patent No. 2,-507,314 is quite similar in its disclosure to the aforesaid Mason Canadian patent No. 427,626, and adds nothing over it which is pertinent to the Jewett and Case invention.

20. The Daniels et al. patent No. 1,-540,766, granted June 9, 1925, discloses a process of treating aluminum or other metals, which comprises heat treating the metal, quenching, treating with a sili-

cate and baking. Such a treatment would not provide a suitable surface on which to coat a diazo light-sensitive resin, to make a presensitized plate, and Daniels et al. do not suggest that it does.

21. None of the prior art anticipates the invention of the patent in suit.

22. The prior art patents and publications made of record during the prosecution of the Jewett and Case applications, and considered by the Patent Office therein, in part duplicate and are the full equivalent of the prior art patents and publications cited and relied upon herein by the defendants. The Patent Office overlooked nothing material.

23. Defendants contended at the trial that material and substantial portions of the invention defined in the claims of the patent in suit were given to one or both of the patentees, Jewett and Case, by another or others prior to the patentees' alleged invention thereof. In this regard defendants urged that material or substantial portions of the invention were derived from Lithoplate, Inc., its president, Elmer F. Deal, and/or his chief technical adviser, Dr. Isadore M. Richlin. Deal and Richlin, and their company Lithoplate, did carry on negotiations with the plaintiff over a period from November 1949 to March or April 1950. The negotiations were primarily directed toward the thought that plaintiff might become the manufacturer of a laminated plate, such as a cellulose acetate film laminated to metal, having the exposed surface of the acetate hydrolyzed and a diazo light-sensitive resin coated thereover. This was an old idea in the art when Deal first discussed it with the plaintiff, and Deal does not now claim to be the inventor of it. While there was some discussion between Deal and Minnesota of the possibility of coating a sensitizer directly on treated aluminum, such as an etched aluminum plate, the primary effort was concerned with (a) coating a film of cellulose acetate onto an etched metal plate and then hydrolyzing the exposed surface of the acetate and coating it with a sensitizer, or (b) sensitizing the surface of a plastic film and then laminating it to a metal or paper backing.

24. Deal's testimony is to the effect that he made some kind of a disclosure to plaintiff of a silicate treatment of aluminum as a step in making a presensitized metal lithographic plate, indicating that this disclosure took place at the meeting in St. Paul on January 11–12, 1950. This testimony is not corroborated by the memorandum of that meeting prepared by Deal's chief technical man, Dr. Richlin, nor by the memorandum of that meeting prepared by Mr. Jewett, nor by the memorandum prepared by Dr. Dowdall. Deal is contradicted by several witnesses, and is not a disinterested witness, being the president of Lithoplate, Inc., one of the defendants in Civil Action No. 58 C 815, pending in Chicago, involving the same patent here in suit.

25. The negotiations and discussions between Lithoplate, Inc. and plaintiff were formally terminated by a letter of plaintiff's vice president Hatch, dated April 10, 1950; but Deal came to a decision himself about the last week in March, 1950, not to enter into a contract with Minnesota, and had no further contacts with Minnesota. When Deal decided that he could not reach a suitable agreement with Minnesota, he immediately started preparations for manufacturing a laminated plate in his own factory in Los Angeles. Subsequently Deal and his company did manufacture and sell a laminated lithographic plate, beginning on a pilot plant scale late in the year 1950 (a few months after plaintiff started selling its presensitized metal plate). Lithoplate, Inc. started making the presensitized silicate-treated aluminum plate in 1952. By the time Deal's company started putting a presensitized, silicate-treated aluminum plate on the market, plaintiff had distributed its presensitized silicate-treated aluminum plate throughout the country for many months, and had sold far in excess of $200,000 worth of such plates.

26. During the negotiations and discussions between Lithoplate, Inc. and plaintiff, which occurred between the fall

of 1949 and March or April of 1950, Lithoplate paid nothing to plaintiff and plaintiff paid nothing to Lithoplate.

27. There were many possible chemical treatments of aluminum when Dr. Richlin was concerned with the problem of trying to make a presensitized plate in 1949. He knew of many such treatments, but he had no idea which, if any, would have provided a barrier which would have been effective long enough to be of interest and to which the image would have adhered properly. Deal and Richlin had experience with aluminum having an anodized or otherwise chemically treated surface, but all such plates lacked shelf life, failed to hold the image, or were otherwise unsatisfactory. Dr. Richlin first saw plaintiff's presensitized silicate-treated aluminum plate in 1951, but did not learn until 1954 that the aluminum surface of such plate had a silicate treatment.

28. Jewett and Case are the first, original and joint inventors of the invention defined in the claims of the patent in suit. They did not derive the invention from either Lithoplate, Inc., Deal, Richlin, or anyone else.

29. When the Jewett and Case presensitized aluminum plate was made available in the summer of 1950, it was a novel and unique thing and one of the most significant advances in lithography in twenty years. It was not obvious to those of ordinary skill in the art in 1950, when Jewett and Case made their invention.

30. The problems in obtaining a presensitized metal lithographic plate are complex: The metal must be protected from the diazo (so that the metal will remain highly hydrophilic and will repel ink in the non-image areas, after exposure and development). The diazo must be protected from the metal (so that the diazo will not deteriorate during storage). The light-reacted diazo must adhere to the treated metal very strongly in the image areas (so that the plate will have a long press life). And the metal in the non-image areas must not only be highly hydrophilic but also must release the unreacted diazo without undue chemical treatment (so that the background will be clean and not pick up ink). All of these characteristics must be combined into a single structure.

31. Each of the claims of the patent in suit is infringed by the accused presensitized metal lithographic plates, exemplified by the "Dualkote" plates, plaintiff's exhibits 8 and 26, and the "Alkote" plates, plaintiff's exhibit 25, made by Polychrome Corp. and sold by defendants. At the pretrial, defendants restricted their contention of non-infringement to two points, namely, (a) that the Polychrome plate "is chemically etched rather than having a smooth surface", and (b) that the Polychrome plate does not have a "hydrophilic film from which excessive soluble silicate and any other soluble materials present have been thoroughly washed away". The accused plates are virtually indistinguishable from the plates of the plaintiff made under the patent in suit. They employ substantially the same means, are used in substantially the same manner, and produce substantially identical results. Their surface is smooth, as defined in the patent, and very different from the surface of the various prior art mechanically grained and deeply etched plates. The silicate surface of the accused plates is substantially free of water soluble materials, within the meaning of the patent and the claims thereof.

32. The infringement of Edwards and Bewal was of a deliberate and aggravated nature. Edwards' original entry into the distribution and sale of presensitized metal lithographic plates in 1951 or 1952 was as a distributor for plaintiff. Edwards recognized plaintiff's plate as distinctly different from the grained zinc albumin plates, with advantages thereover and a shelf life of months instead of hours. Through plaintiff's personnel and know-how, Bewal and Edwards learned how to supply and service accounts with the new presensitized met-

al lithographic plates. Then, in or about April 1958, Bewal and Edwards, with the aid and cooperation of Polychrome Corporation, sought to convert customers and users of plaintiff's plates to the infringing Polychrome plates. Edwards wrote to Polychrome of Minnesota Mining having a "fit" about such activities, and about how "we are making monkeys" of Minnesota Mining. These activities were with the aid and collaboration of Polychrome, acting in concert with Bewal and Edwards. Bewal was the "exclusive franchised dealer for Polychrome Pre-sensitized Aluminum plates" in a wide territory at and prior to the time this action was commenced.

33. By his conduct Edwards aided, participated in, approved, ratified and induced the sale and distribution by Bewal of the Polychrome presensitized metal lithographic plates, in infringement of the patent in suit.

34. The patent in suit gives a sufficiently full, accurate and definite description of the invention, and the manner of making and using it, to enable those skilled in the art to make and use the novel article of manufacture disclosed in the patent and specified in the claims here in suit.

35. Each of the claims of the patent in suit is sufficiently clear, definite and particular to apprise those skilled in the art and the public generally of the scope thereof.

36. Each of the claims of the patent in suit, namely, claims 1, 2, 3, 4 and 5, involves novelty and invention over all of the prior art relied upon by the defendants.

37. The claims in suit are drawn to a new kind of a planographic printing plate, namely, a presensitized metal lithographic plate, having characteristics of great usefulness not possessed by any prior lithographic plate of any kind. As made and sold by Minnesota since August, 1950, it met with immediate public acclaim, has gone into wide-spread commercial use, and has enjoyed an extensive commercial success due to its inherent merit.

38. The patent in suit was not obtained from the Patent Office through misrepresentation.

39. Plaintiff has not been guilty of inequitable conduct, has not misused the patent, and has not come into Court with unclean hands.

Conclusions of Law

A. This Court has jurisdiction of the parties hereto and of the subject matter of this cause.

■ B. Claims 1, 2, 3, 4 and 5 of the Jewett and Case patent No. 2,714,066, all of the claims of said patent, are valid. Clifford L. Jewett and John M. Case are the first, original and joint inventors of the invention defined in the claims of the patent in suit.

C. Each of the aforesaid claims of the said Jewett and Case patent in suit has been infringed by defendants Bewal, Inc. and Benjamine C. Edwards, Jr., by the sale and offer for sale of each of the presensitized metal lithographic plates made by Polychrome Corp. and illustrated and identified by the name and exhibit numbers following:

(a) "Alkote", illustrated by plaintiff's exhibit 25;

(b) "Dualkote", illustrated by plaintiff's exhibit 8; and

(c) "Dualkote", illustrated by plaintiff's exhibit 26.

D. Defendant Edwards is a joint tortfeasor with defendant Bewal, Inc.

■ E. Minnesota has not been guilty of inequitable conduct, has not misused the patent in suit, has not come into court with unclean hands, and is not barred from equitable relief.

F. Plaintiff is entitled to a permanent injunction against further infringement by Bewal, Inc. and Edwards of the claims of the Jewett and Case patent in suit, and to an accounting for damages adequate to compensate for the infringement, and for costs.