BEWAL, INC., a corporation of Kansas; and Benjamine C. Edwards, Jr., Appellants,

v.

MINNESOTA MINING AND MANUFACTURING COMPANY, a corporation of Delaware, Appellee.

No. 6445.

United States Court of Appeals Tenth Circuit.

June 7, 1961.

Rehearing Denied July 26, 1961.

Wayne Coulson, Wichita, Kan. (Lloyd F. Cooper, John H. Widdowson, and Richard A. Loyd, Wichita, Kan., on the brief), for appellants.

Edward A. Haight, Chicago, Ill. (George B. Powers and Malcolm Miller, Wichita, Kan., and Harold J. Kinney and Stanley G. DeLaHunt, St. Paul, Minn., on the brief), for appellee.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

PICKETT, Circuit Judge.

Minnesota Mining and Manufacturing Company, a Delaware corporation, brought this action alleging that its patent No. 2,714,066 [1] had been infringed by the defendants, Bewal, Inc., which was sales agent for Polychrome Corporation, the manufacturer of the accused product, and Benjamine C. Edwards, Jr., who was president of Bewal, Inc. The defense included a denial of both the validity of the patent and the infringement. The trial court found that the patent is valid and had been infringed.[2] The defendants were enjoined from further infringement, and the matter was referred to a master for a determination of damages.

The patent relates to a presensitized lithographic plate used in printing. Lithography is a process of printing from a plane surface without raised type or engraved images. To accomplish the desired results, the plates are required to have a printing image which repels water and retains greasy ink, and a non-image surface which retains water. The process employs the principle that oil and water do not mix. The effective use of the plate depends upon its ability to attract ink only on the image area. Customarily, the plate is mounted on a cylinder in a press, and, as it revolves, the plate is dampened with water, and the image area is supplied with the required ink, which is repelled by the damp, non-image surface.[3] The plate is then pressed against the rubber surface of an offset cylinder which removes the ink and transfers it to the paper.

The patent in suit describes the invention as being:

"especially concerned with a plate formed from a thin metal sheet having at least one surface thereof

---

1. This patent was issued by the Commissioner of Patents on July 26, 1955 to Clifford L. Jewett and John M. Case, employees of the plaintiff, which is now the exclusive owner thereof. The patent is based upon the original application filed December 6, 1950.

2. The Court's Findings of Fact and Conclusions of Law are found in Minnesota Mining & Mfg. Co. v. Bewal, Inc., D.C. Kan., 183 F.Supp. 794, 795.

3. The patent refers to the lithographic plate art as it existed at the time of this invention as follows:
 "Prior to the present invention the lithographic plates employed in commerce and industry have consisted mainly of grained zinc plates, commonly produced by people who are in the business of graining plates. These grained plates are customarily supplied to a large number of shops throughout the country that make finished plates for the printer and lithographer. These shops coat the grained zinc plates with a suitable composition, normally colloidal and most usually an albumin, ammonium bichromate solution and then, following drying, promptly expose the sensitized plate, through a suitable stencil or negative, to secure the desired image, then apply a developing ink (by swabbing) to the entire surface of the plate, then wash the entire plate with water to wash off the unexposed colloidal and water-soluble materials and developing ink adhering thereto (which develops the image, whereupon the plate maker can see whether he has a good plate and the light-reacted albumin-bichromate layer is thus protected from water, so that it remains ink-receptive), then they apply a gum arabic solution to the printing surface of the plate, and then supply the finished plate to the printer or lithographer, for use on his presses."

treated to provide a tightly bonded, thin, preferably inorganic, hydrophilic surface treatment, formed from a solution of an alkali metal silicate, silicic acid, or other treating agent which will form a permanently hydrophilic scum-preventing and tone-reducing film overlying and in firmly-bonded contact with the surface of the plate, and having a coating of light-sensitive organic material such as a light-sensitive diazo resin or other light-sensitive organic nitrogen-containing material over the exposed hydrophilic treated surface, i. e., over the exposed surface of the scum-preventing and tone-reducing film or treatment. The light-sensitive material is preferably a water-soluble, rapidly light-insolubized organic compound, especially a diazo type of light-sensitive material, as more fully described below."

The principal purpose of the invention is to provide presensitized planographic plates with dimensional stability which are ready for exposure through a negative or stencil, without further treatment, even after storage for a substantial length of time. Jewett and Case sought to create a plate free of the disadvantages of those generally in use, particularly the necessity of exposure and development immediately after the application of the sensitizer. They discovered that when a diazo resin was used as a sensitizer on a sheet of aluminum the metal and diazo reacted with each other, causing a rapid deterioration. They found the answer to this by treating a clean, smooth aluminum sheet with a solution of aqueous sodium silicate which provided a water-retaining surface, or thin film, on the aluminum sheet, and shielded the layer of diazo light-sensitive material from the aluminum. This treatment eliminated the deteriorating effect of reaction with the aluminum during storage. The key to the success of the process was in the protective film on the metal sheet resulting from the silicate treatment. The discovery of the patentees was not the recognition that such film was desirable, but what film would do the job. Application of Jewett [& Case] 247 F. 2d 953, 45 CCPA 714. These plates could be prepared for the press by a lithographer in far less time than the old ones, and less training was required for those using them. A better quality of printing resulted from the smooth plate. The plates were unique in the industry, and had immediate commercial success.[4]

The defendants agree that there was no presensitized lithographic plate in the prior art which anticipated the one described in the plaintiff's patent, but urge that every process used therein was well-known, and that the process described by the patent was only an aggregation of the known processes which were obvious to a person having ordinary skill in the art.[5] The trial court,

4. The following is typical of much of the testimony on the subject:

Michael H. Bruno, Research Director of the Lithographic Technical Foundation, testified: " * * * Lithographic Technical Foundation is responsible for a good many developments in lithography, but I consider the 3–M plate as one of the most significant advancements in lithography in the last twenty years."

Ralph B. Mason, a research chemist at the Aluminum Research Laboratory of the Aluminum Company of America, the named inventor in a patent referred to in Patent No. 2,714,066, stated: "Affiant believes that the development of a presensitized photo-offset plate, or pre-sensitized printing plate, on a metal base, represented a truly significant step forward in the printing plate art and, practically and commercially, represented a new use of aluminum."

"Commercial success in itself is not sufficient to sustain a patent but it is evidence of its validity and in doubtful cases may be the deciding factor. * *." Oliver United Filters v. Silver, 10 Cir., 206 F.2d 658, 663, certiorari denied 346 U.S. 923, 74 S.Ct. 308, 98 L.Ed. 416. See 1 Deller, Walker on Patents § 44. (Deller's Ed. 1957.)

5. In Dow Chem. Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330,

as did the Patent Office, considered the principal patents and the literature relied upon by the defendants,[6] and found that none of the prior art had anticipated the invention of the patent in suit,[7] and that the Patent Office had overlooked no material matter in the prior art and publications. It is quite clear from the evidence that the printing industry had for many years sought a presensitized lithographic plate which would retain stable dimensions, provide a good press life, and could be stored without deterioration, and that these requirements were first met by the Jewett and Case plate.

A duly issued patent is presumed to be valid, and the burden of establishing invalidity rests on the party asserting it. 35 U.S.C.A. § 282. The presumption, which includes the implica-

65 S.Ct. 647, 651, 89 L.Ed. 973, the Court said: "It is elemental that the mere substitution of equivalents which do substantially the same thing in the same way, even though better results may be produced, is not such an invention as will sustain a patent." Accord, Consolidated Electrodynamics Corp. v. Midwestern Instruments, Inc., 10 Cir., 260 F.2d 811.

6. In its findings, the court referred to the patents and publications relied on by defendants at the trial as follows:

"Although defendants originally relied upon more than thirty prior art patents and publications, at the pretrial on January 30, 1960, defendants restricted the prior patents and publications, to be relied upon by them at the trial, to the following:

| U. S. patent No. | 1,540,766 | Daniels et al. | June 9, 1925 |
| U. S. " " | 1,946,153 | Edwards | Feb. 6, 1934 |
| U. S. " " | 2,225,736 | Champion | Dec. 24, 1940 |
| U. S. " " | 2,507,314 | Mason | May 9, 1950 |
| French patent No. | 904,255 | Kalle & Co. | Feb. 19, 1945 |
| German " " | 464,051 | Tutzschke | Aug. 4, 1928 |
| Canadian " " | 427,626 | Mason | May 22, 1945 |
| British " " | 407,830 | Siemens | Mar. 29, 1933 |
| British " " | 433,538 | Siemens | Aug. 12, 1935 |

Report 4116, Dept. of Commerce, CIO, Report No. C–4, published July 7, 1945, entitled 'Report on Diazo Processes Developed by Kalle and Co., A.G.J. I.O.A.' Final Report No. 13, report prepared by J.I.O.A., Washington, D. C. Report No. C–1 published June 17, 1945.

" 'Mitteilungen des Forschungsinstituts und Profieramts fur Edelmetalle an der staatlichen Hohern Fachschule Schwabisch Gmund 12, 1–9, 17–29 (1938).'

"Clerc publication cited by the U. S. Patent Office in file wrappers of the Jewett and Case patent.

" 'Lithography as Found in Germany', article in December 1946 issue of Modern Lithography.

"Ad by Kalle & Co. in 'Der Polygraf', May 20, 1948 issue, page 59.

"The defendants, at the trial, placed primary reliance upon the Kalle French patent No. 904,255, the Mason Canadian patent No. 427,626, and certain other United States and foreign patents." [183 F.Supp. 797.]

---

7. The court also found:

"Jewett and Case were the first to produce a commercially acceptable presensitized metal lithographic plate. The materials used in its manufacture were all old. The diazo light-sensitive resin had been known for upwards of 15 years before the Jewett and Case invention. Sheets of aluminum and solutions of alkali metal silicate were much older. All were available to anyone who might have conceived of the presensitized metal lithographic plate defined in the claims of the patent in suit. No one had combined them to produce a successful plate until Jewett and Case did so; and no one had produced and offered commercially a presensitized metal plate, by any means or method, prior to the presensitized metal plate of plaintiff, made according to the Jewett and Case invention, and first sold in August, 1950."

tion that the patent was not anticipated by prior knowledge and use, may be overcome only by clear and convincing evidence. Jamco, Inc. v. Carlson, 10 Cir., 274 F.2d 338; Consolidated Electrodynamics Corp. v. Midwestern Instruments, Inc., 10 Cir., 260 F.2d 811; Oliver United Filters, Inc. v. Silver, 10 Cir., 206 F.2d 658, certiorari denied 346 U.S. 923, 74 S.Ct. 308, 98 L.Ed. 416; Insul-Wool Insulation Corp. v. Home Insulation, Inc., 10 Cir., 176 F.2d 502. The presumption of validity is strengthened in cases in which the developments relied upon to show invalidity because of anticipation were before the Patent Office. Saul v. International Harvester Co., 7 Cir., 276 F.2d 361; Cold Metal Process Co. v. Republic Steel Corp., 6 Cir., 233 F.2d 828, certiorari denied 352 U.S. 891, 77 S.Ct. 128, 1 L. Ed.2d 86.

■ When old elements are united in such a manner that the union accomplishes either a new result or an old result in a more facile, economical and efficient way in a particular environment which presented peculiar and difficult problems, it is a true combination and patentable. Consolidated Electrodynamics Corp. v. Midwestern Instruments, Inc., supra, 260 F.2d at page 816; Oliver United Filters, Inc. v. Silver, supra. Cf. Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110, certiorari denied 343 U.S. 914, 72 S.Ct. 647, 96 L.Ed. 1329. In Oliver United Filters, Inc. v. Silver, supra, a patent was issued on a combination of parts and developments, all well known to the industry, but the result was one which the manufacturers of beet sugar had unsuccessfully sought for many years. The defense of invalidity was similar to that presented in the instant case. In discussing the applicable law, we said, 206 F.2d at page 662:

"Silver does not contend that he originated any one of the elemental parts or steps of his inventions. He urges, and the patent office agreed, that he was the first to conceive of the use of the combination which is employed in his apparatus and process, and that his invention is in the combination and not in the elements. He readily concedes that all the elements of his combination were known to the art long prior to his inventions but contends that his combination is new. The law is that a combination of old elements is patentable if it accomplishes either a new or an old result, 'in a more facile, economical, and efficient way in a particular environment which presented peculiar and difficult problems.' Harris v. National Machine Works, Inc., 10 Cir., 171 F.2d 85, 88, certiorari denied 336 U.S. 905, 69 S.Ct. 491, 93 L.Ed. 1070; Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034; Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 332, 29 S. Ct. 503, 53 L.Ed. 816; Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, 281, certiorari denied 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342; Haynes Stellite Co. v. Osage Metal Co., Inc., 10 Cir., 110 F.2d 11, 15; Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, 506, 512. In Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162, it was said that, 'The function of a patent is to add to the sum of useful knowledge', and that to constitute invention, 'The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds e sum of its parts is the accumulation of old devices patentable.' * *." But see, 1 Deller, Walker on Patents (Deller's Ed., Supp.1960.)

■ While it is true that Jewett and Case brought together known processes which, viewed in retrospect, appeared to be very simple, yet the methods attempted in the prior art did not lead to a metal presensitized plate even though a need and a ready market therefor had long existed. It was not until

after the plaintiff's plate had been marketed that the invention became obvious even to the leaders in the industry who had attempted to find an answer to the demands. "The fact that others skilled in the art in quest for a solution of the problem failed and that [patentee] first conceived the combination of elements, arrangements and mode of operation embodied in the patent in suit is persuasive evidence that he exercised inventive genius and not mere mechanical skill." Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, 1003, certiorari denied 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430; Accord, Stearns-Roger Mfg. Co. v. Ruth, 10 Cir., 62 F.2d 442.

The evidence is without substantial conflict that plaintiff's invention, as set forth in the claims of the patent, accomplished a new and improved result in a more facile, economical and efficient manner, and solved a peculiar and difficult problem in a particular environment. It made an important contribution to the sum of useful knowledge concerning lithographic plates which was definite and novel, and was not such

that at the time it would have been obvious to a person having ordinary skill in the art of lithography.[8]

The trial court found that each of the claims of the patent in suit was infringed by the accused "dualkote" and "alkote" presensitized plates manufactured by Polychrome Corporation and sold by the defendants. The patent claims refer to a film formed on the surface of an aluminum sheet through the reaction of an aqueous solution of soluble silicate which is "substantially free from water-soluble material." Defendants urge that the Polychrome plate is distinguishable from that of the plaintiffs in that, after the silicate treatment, the surface of the aluminum sheet is not substantially free from water-soluble material. Although there is evidence to the effect that the accused plate, before the application of the light-sensitive diazo resin, is not free from water-soluble material, the difference in the amount of such material on the two plates is so insignificant that it cannot be considered as being without the teaching of the patent.[9] The defendants cannot avoid the provisions of the pat-

---

8. In discussing the validity of a combination patent, we think the statement in Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501, 503–504, is appropriate:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant? In the case at bar the answers to these questions all favor the conclusion that it demanded more intuition

than was possible by the 'ordinary' workers in the field. The needs were known, but the purpose to fulfil them with that minimum of material and labor disclosed in the patent had not appeared; and economy of production is as valid a basis for invention as foresight in the disclosure of new means. In the case at bar the saving of material as compared to anything that had preceded, was very great indeed; the existing devices at once yielded to Reiner's disclosure; his was an answer to the 'long-felt want.' "

9. David N. Kendall, a consulting chemist, a witness for the defendants, concerning the amount of water-soluble material found on the accused plate, testified:

"Q. You said you found 3 per cent citric acid in the water from the accused plate? A. In the 3 per cent, about 3 per cent in the Polychrome plate, yes.

"Q. Now that is 3 per cent of what? A. Three per cent by weight of the total solids extracted by water from the plates.

"Q. And what was the total? A. What was the total what?

ent by adding water-soluble materials unless, of course, the added materials create a result wholly different from those of the patent.[10]

> "Q. Solids extracted by water from the plate. A. Oh, it was in the neighborhood of about 10 milligrams I would say, sir.
> "Q. Now what is 10 milligrams. Is that a drop, or how can we visualize the size of that? A. Well, it might be, it is something depending on the particular housewife, it might be something like what the housewife would take as a 'pinch' of material, a pinch of salt or something like that.
> "Q. A little bit of a pinch, and you say there was 3 per cent of a pinch of citric acid? A. I said there was 3 per cent of the total weight of sample there which is about 10 milligrams. I was just trying to visualize for you what a pinch might be. Excuse me, what 10 milligrams might be.
> "Q. Well now, that 3 per cent citric acid is going to be something less than about a millionth of an ounce, isn't it? A. It will be about .3 milligrams, sir.
> "Q. And expressing that in . grams, what would that be in grams? A. It would be approximately .07 grams, sir.
> "Q. .07 grams? A. Well, rounding it off, it is nearest .01 grams. Actually it is .00 with a third decimal being graded in five, sir, around seven, it would be approximately .01.
> "Q. How much solids did you find in distilled water? A. There was—I don't think I actually weighed them. It was a very small amount. I would imagine about, oh, I would guess about .5 of a gram, something like that. * * *"

10. In Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 607, 70 S. Ct. 854, 856, 94 L.Ed. 1097, the Court said:
> "But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce

minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system." Accord, Weiss v. R. Hoe & Co., 2 Cir., 109 F. 2d 722, certiorari denied 310 U.S. 639, 60 S.Ct. 1085, 84 L.Ed. 1407.

11. The defendant Edwards testified:
> "Q. Let me ask you for what uses those Alkote and Dualkote plates that you sell are sold? A. For lithographic reproduction.
> "Q. And in general they are used by the same people that have used 3M plates? A. Right.
> "Q. For the same general purposes? A. Right.
> "Q. With the same equipment? A. Right.
> "Q. With the same or similar chemicals? A. Right.
> "Q. And with substantially the same results? A. Right."

Jewett testified:
> "Q. There has been testimony as to the process of manufacture used by the defendant and variation of that process from the specific process disclosed in the Jewett and Case patent. Does that variation result in a different structure? A. No, sir, it does not.
> "Q. In the accused plates do they still have the basic structure of the Jewett and Case plates? A. Yes, they do.
> "Q. They have an aluminum sheet, do they? A. Yes, sir.
> "Q. And a silicate treatment on it? A. Yes, sir.
> "Q. And a light-sensitive diazo on top of it? A. That is correct.
> "Q. And the light-sensitive diazo when exposed to light will in the exposed portions be firmly bonded to the treated aluminum sheet? A. That is right.
> "Q. And so far as the industry is concerned do those Polychrome plates here accused serve the same purpose and in the same way and get the same result as the Jewett and Case plates? A. They do."

■ The evidence is without conflict that plaintiff's plate and the accused plate are almost indistinguishable.[11]

The court found:

"They employ substantially the same means, are used in substantially the same manner, and produce substantially identical results. Their surface is smooth, as defined in the patent, and very different from the surface of the various prior art mechanically grained and deeply etched plates. The silicate surface of the accused plates is substantially free of water soluble materials, within the meaning of the patent and the claims thereof."

Colorable differences without substance do not avoid infringement. Southwestern Tool Co. v. Hughes Tool Co., 10 Cir., 98 F.2d 42; Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896. The test of infringement is "whether the two devices do the same work in substantially the same way to accomplish substantially the same result." Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, 503. Accord, Jamco, Inc. v. Carlson, supra; Oliver United Filters, Inc. v. Silver, supra. All the witnesses agree that the accused plates do the same work as plaintiff's plates, and accomplish almost exactly the same result. The infringement is clear.

The defendant Edwards was a majority stockholder, president, and general manager of the defendant Bewal, Inc., which was incorporated in 1952 to perform a contract with plaintiff for the distribution of its plates in a specific area. While Bewal, Inc. was still employed as the distributor for plaintiff's product, he arranged with Polychrome to sell its presensitized plates as an exclusive dealer in the same territory. With the cooperation of Polychrome, he sought to direct customers and users of plaintiff's plates to those of Polychrome. During this time he wrote to Polychrome stating, "Minnesota Mining is having a 'fit'", and "so far, we are making monkeys of them. * * *" "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C.A. § 271(b). Corporate officers are not liable for patent infringement where they have not been active other than as such officers, but if they wilfully and knowingly participate in, induce and approve acts of infringement, they are liable with the corporation for the wrongful acts. Southwestern Tool Co. v. Hughes Tool Co., supra; 3 Deller, Walker on Patents § 442 (Deller's Ed., 1937). The finding that Edwards, by his conduct, "aided, participated in, approved, ratified and induced the sale and distribution by Bewal of the Polychrome presensitized metal lithographic plates" is not clearly erroneous.

Finally it is contended that there was fraudulent conduct in the prosecution of the application in the Patent Office and that plaintiff's conduct during the trial of this case was such that equitable relief should be denied. It is urged that the information leading to the patent process was furnished to the patentees by third parties, Lithoplate, Inc., and Elmer Deal, its president. The argument is that plaintiff received from Lithoplate, Inc. each element needed to complete the plate finally described in the patent; that it was Jewett's purpose to copy Lithoplate, Inc.'s combination and substitute some other intermediate protective layer for the recommended cellulose acetate; and that all that was necessary for this change was to turn to the prior art to find that sodium silicate, which had been suggested by Deal in a meeting at St. Paul, Minnesota, would serve the purpose. In unrestrained language, defendants refer to some of the representations made in the Patent Office as "bare face falsehoods"; they state that plaintiffs "stole" the formula from Lithoplate; and refer to "Jewett's perjury" in efforts to conceal the source of his knowledge.

The trial court found, "Jewett and Case are the first, original and joint inventors of the invention defined in the claims of the patent in suit. They did not derive the invention from

either Lithoplate, Inc., Deal, Richlin, or anyone else." This finding is sustained by the evidence. Lithoplate, Inc. was engaged in the manufacture of lithographic plates and was desirous of developing a marketable presensitized plate. There were negotiations and discussions between plaintiff and Deal, representing Lithoplate, together with its chief technical advisor Richlin, from November of 1949 to March or early April of 1950. These discussions, along with some experiments, were primarily directed toward the development of a plate with a cellulose acetate film, laminated to metal, having an exposed surface of the acetate hydrolized, and coated with a diazo light-sensitive resin. It was thought that the film of cellulose acetate might be successful on an etched metal plate. The possibility of sensitizing the surface of a plastic film, and then laminating it to a metal or paper backing was also discussed. These discussions and negotiations bore no fruit and were terminated by a letter from the vice-president of plaintiff on April 10, 1950. The ideas considered by the parties were old, and Lithoplate did not claim to be the inventor of any of them. A disclosure to the Patent Office of these negotiations would have added little, if anything, to the material which it had. The patent refers to prior use of a cellulose acetate layer on the metal to protect the sensitizer.

 The plaintiff was convinced that a formula or treatment of metal could be found which would protect the light-sensitive diazo compound from the deteriorating effect of the metal. It therefore decided to continue the study. Within a short time thereafter, Jewett and Case, while making routine experiments, found that treatment of a clean aluminum sheet in a solution of sodium silicate brought about the desired result. The plates suggested by Lithoplate were never manufactured or sold by the plaintiff. Lithoplate, Inc. continued its efforts, and during the year 1950, manufactured and sold a laminated cellulose acetate lithographic plate which proved to be unsuccessful and was discontinued in 1952. It then began to make and market a silicate treated presensitized aluminum plate. Deal testified that during the period of his discussions, experiments and negotiations with plaintiff, he disclosed, at a meeting in St. Paul, Minnesota, that the treatment of an aluminum sheet with a silicate solution might be the answer to the problem. There is no documentary corroboration of this disclosure. The memorandum of the meeting where the information was said to have been given does not mention it. The testimony is contradicted by several witnesses whom the trial court saw fit to believe. Furthermore, the so-called "steal from Deal" is an issue which cannot be determined in this action.[12] The file history of the Jewett and Case patent contains this statement:

"However, insofar as we are aware, no one has ever previously produced any commercially acceptable presensitized metal-backed planographic plate; and no one has ever previously produced any presensitized planographic plate of any construction which will compete with grained zinc plates of the prior art, as above described, where long press life and quality reproductions are important. Our plate, on the other hand, is a presensitized metal plate, and yet will produce work with a sharpness of dots and lines, and other details, considerably beyond what can be produced with the conventional commercial albumin-coated grained zinc plates of the prior art.

"Light-sensitive diazo resins and other like light-sensitive organic materials are notably sensitive to metals. For example, Kalle British Patent No. 699,413, published November 4, 1953, at page 1, points out that if water-soluble diazo com-

---

12. An action is now pending in another jurisdiction wherein it is alleged that the plate marketed by Lithoplate infringes the Jewett and Case patent.

pounds, or like light-sensitive substances, are coated on metal supports, a plate which can be stored in the unexposed state, i. e. a presensitized plate, cannot be made, 'owing to the decomposition of the light-sensitive substance caused by the metal.' Others concerned with metal plates have coated them with a substantial layer of cellulose acetate, or other material, and then hydrolyzed the surface of the acetate and coated the diazo resin or equivalent thereover. No one, insofar as we are aware, ever visualized that aluminum or other metal plates could be used to receive a coating of a light-sensitive diazo resin, or the like, by the simple expedient of first briefly treating the metal surface with an aqueous alkali metal silicate, silicic acid, or equivalent, which will give the metal a permanently hydrophilic surface, e. g. a scum-preventing surface film, and will not measurably increase the thickness of the metal plate. Furthermore, a plate made as just indicated has outstanding quality and performance characteristics, not possessed by any prior plate, and this was also entirely unappreciated heretofore, to the best of our knowledge and belief.

\* \* \* \* \* \*

"Insofar as we are aware, prior to our invention there had never been a satisfactory presensitized metal lithograph plate; nor had there been any presensitized metal lithographic plate on the market."

It was also represented to the Patent Office that the applicants had accomplished a result which "neither Kalle & Co. nor anyone else had been able to accomplish, and applicants thereby created a new era in the lithographic printing field."

The trial court, in minute detail, found these statements to be true, and the findings do not appear to be clear-ly erroneous. They are, we think, sustained by the evidence.

We find no conduct on the part of the plaintiff, its employees, or its attorneys, during the pretrial proceedings, or in the trial of the case, which would deprive the plaintiff of the relief sought or warrant a reversal.

Affirmed.