**KING–SEELEY THERMOS CO.,**
Appellant,

v.

**REFRIGERATED DISPENSERS, INC.,**
**Diamond Ice Machine Company, and**
**the Diamond Corporation, Appellees.**

**No. 8016.**

United States Court of Appeals
Tenth Circuit.

Dec. 27, 1965.

Don K. Harness, of Harness, Dickey & Pierce, Detroit, Mich. (Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Oklahoma City, Okl., and Cyrus G. Minkler, Detroit, Mich., with him on the brief), for appellant.

Morris Spector, Chicago, Ill. (Head & Johnson and Paul H. Johnson, Tulsa, Okl., with him on the brief), for appellees.

Before PHILLIPS, PICKETT and HILL, Circuit Judges.

PICKETT, Circuit Judge.

The appellant, King-Seeley Thermos Company, is a Michigan corporation and the owner of U.S. Letters Patent Nos. 2,753,694, (694), and 3,034,311, (311), relating to machines for making flaked ice.[1] It brought this action alleging that the appellees were committing acts of infringement upon the aforesaid patents. By answer, the appellees denied infringement and alleged invalidity of the patents in suit on various grounds, and by counterclaim asked for a judgment declaring the patents involved to be invalid and not

[1]. King-Seeley Thermos Company is the successor to Queen Stove Works, Inc., former owner of the patents in suit, and will be referred to herein as "plaintiff" or "King-Seeley." The defendant The Diamond Corporation results from a merger of Refrigerated Dispensers, Inc., and Diamond Ice Machine Company, and will be referred to herein as "defendant."

infringed. The trial court held that the patents were invalid and that Claim 4 of Patent 694, and Claim 9 of Patent 311 were not infringed.

The machines defined in plaintiff's two patents are designed to manufacture saleable flake ice under varying conditions. They consist of a vertical, elongated, cylindrical freezing compartment which is surrounded by a freezing jacket. Water is supplied to the cylinder through an inlet tube near the bottom, and is maintained at a uniform level. Within the freezing compartment is a rotatable auger with its blades closely fitted to the cylinder wall. The auger is rotated by a motor at a speed which permits ice to be frozen on the cylinder wall. The thin layer of ice is then scraped from the cylinder wall by the action of the auger blades, and conveyed upward as a hollow column of ice. When the ice reaches the top of the cylinder it is saturated with water trapped between the thin layers, and is unusable "slush ice."

The upper end of the cylinder is closed, with a stationary solid bronze unit extending downward within the cylinder to a point above the upper portions of the auger. The unit is referred to as a "breaker-head" in the 694 machine, the lower end having a beveled surface for peeling the ice from the auger and breaking and deflecting the column of slush ice and changing its direction as it is conveyed upward. Inside the breaker-head is a stainless steel "bushing", or bearing, to keep the upper end of the auger shaft steady.

As to the 694 patent, Claim 4 is the only one in suit. It reads:

"4. An ice chip producing machine comprising

an elongated freezing chamber having an open end,

means for supplying water to the inside of said freezing chamber,

means for cooling at least a portion of said freezing chamber to freeze ice on the inside surface thereof,

an ice conveying auger rotatably mounted in the freezing chamber with its spiral edge disposed in closely spaced relation to the inside wall of said chamber,

means for constantly rotating the auger to cause said spiral edge to shear off ice frozen on the inside wall of the chamber constantly to deliver ice to said open end of the freezing chamber,

and an outwardly inclined ice disintegrating and removing member positioned in said open end of the chamber and provided with an ice peeling mold-board-like surface positioned to engage ice carried by the auger,

said constant rotation of the auger serving positively and constantly to convey ice to and force it against said mold-board-like surface to break up and positively remove ice from the auger and discharge it as discrete ice chips."

The trial court held that all the elements of this claim are old in the art, and disclosed in the Bartlett Patent No. 2,418,746, and a machine invented by Nitsch and incorporated in a machine furnished to plaintiff's successor by Nitsch and Hamner.

It is undisputed that as the ice column is pressed against the "mold-board-like" surface of the breaker-head by the upward movement of the auger, it is broken up, thereby releasing the entrapped water to such an extent that relatively dry, discrete ice chips are discharged through windows in the cylinder wall into a storage bin in a condition which prevents welding or packing together.

Prior to the year 1950 there was a substantial commercial and industrial demand for crushed or flaked ice. Local ice dealers generally satisfied this demand by crushing blocks of ice or ice cubes. There was no machine on the market which would manufacture a suitable or saleable ice flake. John M. Nitsch and George F. Hamner of Tuscaloosa, Alabama, experimented for years attempting to perfect such a machine, but they were not successful. However

in 1952, Nitsch was issued U.S. Letters Patent No. 2,597,515. Prior to this time King-Seeley's predecessor was engaged in the manufacture and sale of automatic ice cube machines. It learned of the Nitsch and Hamner efforts and arranged for delivery of the machine to its factory in Michigan. Plaintiff obtained a license from Nitsch, and thereafter acquired the patent.

The success of a flake-ice producing machine of this type depended upon a practicable method of freezing the water to a proper consistency and then removing the excess water therefrom. Nitsch and Hamner had experimented with a triangular sheet metal ice splitter[2] at the top and outside of the cylinder, but the only reliable evidence reveals that it did not tend to solve the difficulties, and the machines continued to produce only unsaleable ice. King-Seeley's engineers unsuccessfully experimented for months with the Nitsch machine, both with and without the ice splitter. It was not until the development of the combination of the auger-freezing chamber arrangement and the breaker-head device of patent 694 by which excess water was removed from the ice, that a successful machine was produced.[3] For efficiency purposes, the original 694 breaker-head was improved by placing on it two beveled surfaces which divided the ice column. There was pressure against each of the beveled surfaces in the same general manner as when there was but one curved, or beveled, surface. The ice was then discharged from the cylinder through two openings rather than one. The success of this machine, simple as it may seem in retrospect, resulted from the use of the breaker-head in the top portion of the vertical freezing cylinder against which the column of thin ice layers is compressed, disintegrated and dewatered. It had immediate commercial suc-

cess, as from 1952 to 1963 approximately 80,000 units were sold for about $50,000,-000.[4] After considering the Nitsch machine and others, the patent office issued letters patent No. 694.

■ There is no substantial conflict in the evidence as to the foregoing facts. It was contended by King-Seeley in the trial court, as it is here, that while all the elements of its machines, as disclosed in Patents 694 and 311, may not be new to the art, the combination of these elements in its machines, which were the first to produce flake ice acceptable to the market, was an invention subject to patent. We agree with this contention.

■ It is elementary patent law that a regularly issued patent is presumed valid, and a party asserting invalidity has the burden of establishing such invalidity by clear and convincing evidence. 35 U.S.C. § 282; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983; M. B. Skinner Co. v. Continental Industries, Inc., 10 Cir., 346 F.2d 170; McCullough Tool Co. v. Well Surveys, Inc., 10 Cir., 343 F.2d 381; Mott Corp. v. Sunflower Industries, Inc., 10 Cir., 314 F.2d 872; Admiral Corp. v. Zenith Radio Corp., 10 Cir., 296 F.2d 708; Bewal, Inc. v. Minnesota Mining and Mfg. Co., 10 Cir., 292 F.2d 159; Jamco, Inc. v. Carlson, 10 Cir., 274 F.2d 338. One asserting the invalidity of a patent on the ground of anticipation in the prior art has the same burden of proof. Mott Corp. v. Sunflower Industries, Inc., supra, 314 F.2d at 879; Consolidated Electro. Corp. v. Midwestern Instruments, 10 Cir., 260 F.2d 811; Hollywood-Maxwell Co. v. Street's of Tulsa, 10 Cir., 183 F.2d 261.

■■ A combination of various elements already known to the art is patentable if it accomplishes either a new or an old result "in a more facile, economi-

---

2. Nitsch described this splitter as "something like four or five inches long and maybe three inches wide just about like a piece of pie."

3. The 694 patent states that it is "an improvement on the machine disclosed

and claimed in Patent No. 2,597,515, granted to John M. Nitsch on May 20, 1952.

4. All these units used the breaker-head of the 694 patent, or an improvement of that head.

cal, and efficient way in a particular environment which presented peculiar and difficult problems." Consolidated Electro. Corp. v. Midwestern Instruments, supra, 260 F.2d at 816; Oliver United Filters v. Silver, 10 Cir., 206 F.2d 658, 662; Harris v. National Machine Works, 10 Cir., 171 F.2d 85, 88, cert. denied 336 U.S. 905, 69 S.Ct. 491, 93 L.Ed. 1070, reh. denied 336 U.S. 929, 69 S.Ct. 655, 93 L.Ed. 1090. As said in Mott Corp. v. Sunflower Industries, Inc., supra, 314 F.2d at 879, "An invention or discovery is new or possesses the requisite element of novelty if it involves the presence of some element, or the new position of an old element in combination, different from anything found in any prior structure."

To be patentable, the machine or process must add to the existing art something new and useful which is not obvious to one of ordinary skill in the art pertaining to the subject matter. 35 U.S.C. § 103;[5] Mott Corp. v. Sunflower Industries, Inc., supra; Admiral Corp. v. Zenith Radio Corp., supra. In more simple language, an alleged invention is not patentable if prior development by others was sufficient to make it obvious to a knowledgeable person, or if it is nothing more than an application of mechanical skill. Obviousness is to be determined as of the time when a solution of the problem was being sought, not after the time when the solution has been pointed out.

In determining whether an improvement is an invention or merely the work of a mechanic skilled in the art, simplicity of the improvement is not important if the improvement by combination actually contributes something more than mechanical skill. The court may examine the existing art to determine whether it has been substantially advanced by the alleged invention. As was said in Oliver United Filters v. Silver,

supra, 206 F.2d at 663–664, "If it has done so, there should be a liberal construction of the patent to secure to the inventor the reward which he deserves. This is especially true when for the first time there has been commercial success of the invention. Commercial success in itself is not sufficient to sustain a patent but it is evidence of its validity and in doubtful cases may be the deciding factor." See also, Mott Corp. v. Sunflower Industries, Inc., supra.

The record discloses that although a need long existed, prior to the development of plaintiff's machines no one had been able to perfect a process which would produce marketable flake ice. The conclusion is inescapable that plaintiff has not only contributed substantially to the solution of the existing difficulties in producing such ice, but has found a solution. We think that Claim 4 of the 694 Patent clearly discloses a process of making a column of slush ice, or soft ice, in a freezing compartment, and then compressing it against the breaker-head, by means of an auger, for disintegration and removal of excess water; this is new and novel. The breaker-head serves no other purpose. Furthermore, even though the patent claim did not specifically use the terms "slush ice", and "compression", the patentee is entitled to all the benefits and advantages of his patent. Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163, reh. denied 293 U.S. 522, 55 S.Ct. 66, 79 L.Ed. 634; Talon, Inc. v. Union Slide Fastener, Inc., 9 Cir., 266 F.2d 731; Tropic-Aire, Inc. v. Cullen-Thompson Motor Co., 10 Cir., 107 F.2d 671; Byers Machine Co. v. Keystone Driller Co., 6 Cir., 44 F.2d 283, cert. denied 293 U.S. 572, 55 S.Ct. 103, 79 L.Ed. 670; Horton Mfg. Co. v. White Lily Mfg. Co., 7 Cir., 213 F. 471.

---

5. The statutory test for patentability is whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103.

■ It is urged, and the trial court found, that the teaching of the Nitsch machine, with its sheet metal divider, was sufficient to enable a person of ordinary skill in the art to reconstruct a new machine which would produce commercial flake ice. Although the Nitsch machine is similar in many respects to plaintiff's patented machine, the evidence is overwhelming that it was a failure and disclosed nothing which assisted in any manner in solving the problem of disintegrating the column of ice and removing the excess water in its upward movement from the cylinder, or any other place, before it reached the bin. The so-called "sheet metal ice divider", or splitter, was an experiment which accomplished nothing. It was not part of the Nitsch machine; it was not mentioned in his patent; and there was no disclosure which would require reference to it in plaintiff's application for the patents in suit. Plaintiff's machine succeeded because for the first time it combined old elements with a new element which would create soft ice in the freezing chamber, convey it to the top of the cylinder, and there cause the ice column to be disintegrated by compression on the curved surface of the breaker-head to such an extent that excess water was eliminated and soft ice flakes deposited in a bin where they could be easily handled with a "scoop." This combination produced a new result in the field of flake icemaking. No one in the art had been able to accomplish this before. There is no prior art reference which anticipates this combination.[6] The finding of the trial court that Claim 4 of Patent 694 produces no new or apparent result over the Nitsch machine, and was drawn to an old and exhausted combination, is clearly erroneous and unsupported by the evidence.[7]

■ The 311 patent relates to a flake ice making machine which is similar in principle to, and an improvement of, the 694 machine. The difference is essentially in the breaker-head arrangement. This development is a modified arrangement of parts to obtain a greater production of ice. The market for the machine is limited to those businesses which require the use of a substantial amount of chipped ice. This greater production results from a breaker-head which simultaneously disintegrates and compresses the ice column as it leaves the upper end of the freezing chamber, followed by an axial discharge of the usable ice. Claim 9 of this patent is the only claim in suit, and reads:

"9. In an ice making machine comprising

a cylindrical freezing chamber,

means for cooling the freezing chamber,

means for supplying water to the freezing chamber,

means including a spiral flight for advancing ice axially of the chamber,

the improvement comprising closure means for the end of the chamber towards which the ice is advanced defining substantially axially extending aperture means for effecting concomitant compression and

6. U.S. Patent to Bartlett No. 2,418,746, was designed to freeze fruit in a syrup disposed in a horizontal tank. It is not an ice making machine and has no moisture-removing device. It could not use a breaker-head such as that of plaintiff's machines.

7. Patent 694 has been held to be valid in King-Seeley Corp. v. Cold Corp. of America, U.S.D.C., N.D.Ill., E.Div., 182 F.Supp. 768, and King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., U.S. D.C., N.D.Ill., E.Div., decided March 26, 1965, and now pending on appeal. In oral argument counsel for the defendants conceded that they had not sustained the burden of proving the patent to be invalid. The trial court recognized that admissions of defendant's counsel and the testimony of its expert witness tended to support the validity of the patents in suit. Implying some sinister motive, the court stated, in effect, it was not bound by the admission or the testimony of the expert as it has a duty to the public. In support of the trial court's position, defendant-appellant's counsel argues that the court is not required to abandon its decision-making powers to counsel or a witness.

axial discharge of ice outwardly of the freezing chamber,

the aperture means defined by said closure means being generally axially aligned with the freezing chamber and having a radial cross-sectional area relatively smaller than the radial cross-sectional area of the freezing chamber adjacent the terminal end of the flight to effect compression of the ice upon movement thereof axially of said closure member."

The District Court held Claim 9 to be invalid, apparently for the reason that defendant's licensor manufactured and sold the first flake making ice machine two and one-half years before Claim 9 was first presented to the patent office and was drafted during the pendency of the application for the specific purpose of covering defendant's machines. We find no evidence in the record to support this finding, particularly in view of the testimony of defendant's expert to the effect that Claim 9 was sufficiently supported by the original patent application disclosure filed in the patent office in 1957, long before the licensor or defendant manufactured or sold ice making machines.[8] We held in Sears, Roebuck & Co. v. Jones, 10 Cir., 308 F.2d 705, cert.

denied 371 U.S. 952, 83 S.Ct. 509, 9 L.Ed. 2d 501, that a patent claim is valid even if added to a patent application for the first time after another party has manufactured and sold an infringing product if that claim is supported by the disclosure in the patent application filed before any such use or sale by the infringer. See Wagenhorst v. Hydraulic Steel Co., 6 Cir., 27 F.2d 27.

The trial court also found that Claim 9 was invalid because it was disclosed by the prior art. Reference was made to a number of patents.[9] Some of these patents were discussed in the evidence; some were not. None of them relate to an ice making machine, and none of them disclose a machine will simultaneously compress and discharge ice or any other material therefrom. None of these references in any manner anticipate the machine described in Claim 9.

This brings us to the question of infringement. The trial court held that Claim 4 of the 694 patent, and Claim 9 of the 311 patent, were not infringed. There is no contention that there is any substantial difference in the King-Seeley machines and those manufactured and sold by defendant, except for the breaker-head arrangement. The accused machine freezes ice on the wall of a vertical cylin-

8. Defendant's expert witness testified on this subject as follows:

"Q. All right. Now, we can agree that the 1957 drawings, the ones that were filed initially in the Nelson 311 Patent, are then—do then support all the elements called for in Claim 9, is that correct? A. Let's go to Element G. It says the aperture means defined by said closure means being generally axially aligned with the freezing chamber and having a radial cross-sectional area relatively smaller than the radial cross-sectional area of the freezing chamber adjacent to the terminal end of the flight to effect compression of the ice upon movement thereof axially of said closure member.

Q. Yes. A. Do I take it that you construe the relatively larger ends as being between the tips of the knife members and—

Q. No. These are axially extending openings going up through there, are they not? A. Yes.

Q. Well, don't they have a lesser cross-sectional area, radial cross-section area, than the area of the freezing chamber immediately adjacent to them? A. Yes, sir.

Q. Well, then, this disclosure supports that element of the claim, does it not? A. Yes, sir.

Q. All right. So then we can agree that the initial 1957 drawings do, in the Nelson 311 Patent—do support all and and have all the elements called for in Claim 9 of the Nelson patent, is that right? A. Yes, sir."

9. These references included British Patent No. 409,499; U.S. Patents Heyman et al. patent 1,641,429; Anderson patent 647,354; Johnson patent 1,576,137; Baker patent 1,738,275; Christensen et al. patent 1,798,725; Grayson patent 1,910,009; Harrington patent 2,266,032; and Bartlett patent 2,418,746.

der, from which it is removed and conveyed to the top of the cylinder by the action of an auger. Immediately above the cylinder, and as part of the auger mechanism, is an inverted truncated cone-shaped breaker-head. It is argued that this breaker-head does not read on Claim 4 of patent 694, because it does not have the mold-board-like surface to positively remove the ice from the auger, or a structure which serves to "peel" the ice from the auger. The breaker-head of the defendant's machine is attached to the auger shaft and has a curved surface of 360 degrees immediately above the top of the cylinder. When the ice column is lifted by the auger, it encounters the circular and sloping surface of the breaker-head and, after disintegration, the ice flakes are discharged on all sides. When the column of ice rises by similar action in the 694 machine, it is forced against only one curved surface and is discharged through one window in the cylinder. In the improved head, two curved surfaces and two windows are supplied, but the result in each instance is substantially the same. In the plaintiff's machine, and in the accused machine, a column of ice is forced upward in the freezing compartment until it encounters a curved surface of the breaker-head, where it is compressed sufficiently to disintegrate the column, release the excess water, and deflect the discrete ice chips into a storage bin in such condition that it does not stick or weld together. The trial court found that defendant's machine does not include "an outwardly inclined ice disintegrating and removing member position in said open end of the chamber and provided with an ice peeling mold-board-like surface positioned to engage ice carried by the auger", as called for in Claim 4 of Patent 694. Defendants contend that the inverted truncated cone-shape breaker-head used in their machines does not have an ice peeling, mold-board-like surface or its equivalent. The patent experts were in agreement that "mold-board surface" may be of various shapes, including that used in plaintiff's machine and in defendant's machine.

Infringement is not avoided by making a machine which differs in form but appropriates the principle and mode of operation of the patented machine by the use of the same or equivalent means. Jamco, Inc. v. Carlson, supra; Jones v. Bodaness, 10 Cir., 189 F.2d 838; Stearns-Roger Mfg. Co. v. Ruth, 10 Cir., 62 F.2d 422; Johns-Manville Corp. v. National Tank Seal Co., 10 Cir., 49 F.2d 142. Infringement exists if the accused device performs substantially the same function in substantially the same way and accomplishes substantially the same result as the patented device, even though they differ in name, form and shape. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854 94 L.Ed. 1097, reh. denied 340 U.S. 845, 71 S.Ct. 12, 95 L.Ed. 620. If the accused machine falls clearly and definitely within the claim of a patent, infringement is made out. McCullough Tool Co. v. Well Survey, Inc., supra.[10] The protection of the provisions of a patent cannot be avoided by adding materials unless a wholly different result is obtained. "Colorable differences without substance do not avoid infringement." Bewal, Inc. v. Minnesota Mining and Mfg. Co., supra, 292 F.2d at 167. Cf. Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501, cert. denied 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388, reh. denied 366 U.S. 978, 81 S.Ct. 1918, 6 L.Ed.2d 1268.

The record, we think, establishes without dispute that the accused machine produces substantially the same type of ice in substantially the same manner as plaintiff's machine. Both freeze and convey thin strips of ice upward in

10. In McCullough Tool Co. v. Well Surveys, Inc., 10 Cir., 343 F.2d 381, 401, the court states that "the true test of infringement is whether the accused device and the device covered by the patent do the same work in substantially the same way to accomplish substantially the same result." See also, Bewal, Inc. v. Minnesota Mining and Mfg. Co., 10 Cir., 292 F.2d 159.

a freezing chamber by means of an auger, where it is compressed against a curved or sloping surface sufficiently to disintegrate the column of ice, remove excess water, and deflect the ice into a storage bin as discrete ice chips. The contention of the plaintiffs that the doctrine of "file-wrapper estoppel" is applicable here, is without merit. Defendant's machine reads directly on Claim 4 of the 694 Patent, and there is a literal infringement. There is no need to go beyond this claim to determine its purpose. The finding of the trial court that Claim 9 of the 311 Patent was not infringed is clearly erroneous. All the evidence is to the contrary, and defendant's expert witness testified that the accused machine had all the elements called for in Claim 9.[11] Defendant's machines produce chipped ice substantially the same as that of the plaintiff's machine, by use of a device which is substantially the same.

Judgment is reversed, and the case remanded for further proceedings for an accounting.

11. The testimony of the defendant's expert witness was as follows:

"Q. Now, when we refer over to the defendant's—drawing of the defendant's device, did you say you had a problem on whether or not this device had all the elements called for in Claim 9? A. Yes, sir.

Q. Why is that? A. Well, beginning with the aperture means defined by the—

Q. Down here in Element G? A. Yes.

Q. Yes, sir. A. (Continuing.) 'Said closure means being generally axially aligned.'

Q. Don't you see an aperture going up here between the wall of the cylinder in green and the conical member of the portion of the prime shown in blue from Y to X? A. Yes. Let me get closer.

Q. Right from here to here? A. From there to there.

Q. And doesn't it have some axially extent from here up to here, from Y to X? A. Some axial extent, yes; I'll say some axial extent.

Q. And doesn't it have a radial cross-section area less than the cross-section area of the adjacent freezing chamber just below it? A. Yes.

Q. So then wouldn't that Claim 9 have all of the elements—I should reverse that. Doesn't the defendant's structure, as shown in Plaintiff's Exhibit 29-A, have all the elements called for in Claim 9 of the 311 patent? A. Yes, sir.

Q. Thank you. Now, I'd like to have you refer for the moment, if you would, Mr. Wade, to the Nelson 311 Patent. There are several of the claims of that patent, for instance, such as Claim 7 and Claim 8, which call for the aperture means being circumferentially spaced, are they not? A. This is which one?

Q. 311 Patent. A. Oh, yes.

Q. Nelson 311, looking at some of the claims not in this suit, like 7 and 8— 6, 7, and 8— A. What is your question, sir?

Q. They call for circumferentially spaced apertures, don't they; several of the other claims have that limitation? A. Yes.

Q. There is no such limitation in Claim 9, is there, Mr. Wade? A. In cancelled Claim 9?

Q. No, in Claim 9 in suit. It is right up here on the chart. There is no such limitation in this claim as in several of the other claims as to circumferentially spaced apertures? A. Yes.

Q. There is not; am I correct in that? A. That is right."