**GRINNELL CORPORATION, Plaintiff,**

v.

**The AMERICAN MONORAIL COMPANY, and American Monorail Company, Defendants.**

**Civ. A. No. 4216.**

United States District Court
D. South Carolina,
Greenville Division.

Heard Jan. 24, 1966 and April 25, 1967.
Decided Aug. 23, 1967.

C. Thomas Wyche, of Wyche, Burgess, Freeman & Parham, Greenville, S. C., Henry R. Ashton, and Charles B. Smith, of Fish, Richardson & Neave, New York City, David D. McKenney and Herman Foster, Providence, R. I., for plaintiff.

Donald L. Ferguson, of Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., B. D. Watts and Thomas E. Fisher, of Watts & Fisher, Cleveland, Ohio, for defendants.

HEMPHILL, District Judge.

By complaint filed November 9, 1962 plaintiff sues for infringement of Fain patent 2,981,644 which issued to it April 25, 1961 on an application filed by Mitchell S. Fain. The patent, entitled Method of Cleaning Looms, relates to a method of removing lint from a series of looms arranged in a row. The method involves the use of a high velocity stream of air which is directed down onto looms and is continuously moved through a particular path, as described and claimed in the patent, in order to blow lint off the looms, but without interfering with the operation.

Plaintiff Grinnell Corporation is a Delaware corporation having its principal place of business in Providence, Rhode Island is the owner of the Fain patent by virtue of assignment from the inventor.

Grinnell is a manufacturer, *inter alia*, of loom cleaning equipment (loom cleaners, tracks, controls, etc.) which are sold to textile plants as loom cleaning systems by Grinnell's wholly owned subsidiary, American Moistening Company.

The original defendant, The American Monorail Company, is a corporation of Ohio and has a regular and established place of business at Greenville, South Carolina. By stipulation filed in Court September 14, 1965 and approved by the Court, American Monorail Company, an Ohio corporation, was added to the case as an additional defendant. The additional defendant, American Monorail Company, is the surviving corporation of a merger of the original defendant into A. M. Manufacturing Company, a corporation of Ohio, effective February 16, 1965. For convenience, the two defendants will be referred to herein as "defendant" or "American Monorail."

Defendant manufactures, *inter alia*, loom cleaning equipment which it sells as loom cleaning systems to textile plants, a major portion of its sales being made through its Greenville, South Carolina office. In the course of its sales activities, American Monorail frequently installs and operates trial installations of loom cleaning systems in the weave rooms of prospective customers.

Defendant filed answer and counterclaim December 28, 1962, later amended. Plaintiff filed reply January 18, 1963. Plaintiff seeks an injunction against further infringement and damages for past infringement. Defendant's counterclaim seeks a declaratory judgment of patent invalidity and non-infringement.

There is no issue as to jurisdiction or venue nor as to plaintiff's sole ownership of the Fain patent or its right to sue and recover for all past infringements.

■ The basic issues are:

1. Whether the claims of the Fain patent, which are for a method of cleaning looms, are infringed [1] by defendant's use of that method. The burden of proof on this issue is on plaintiff.

2. Whether the claims of the Fain patent are valid. The burden of proof on this issue is on defendant, who has charged invalidity on several grounds.

3. Whether plaintiff, by virtue of its activities, has "misused" the Fain patent and is thus barred from maintaining this action because of unclean hands. The burden of proof on this issue is on defendant.

The history of the patent system largely parallels the economic growth of the nation. The objectives and achievements of the system are well summarized in a study prepared in 1956 for the Patent Subcommittee of the Senate Judiciary Committee:

Those who built the governmental structure under which we live were exceedingly wise, and they were particularly so when they created a strong patent system based on the Constitution. It has three great objectives:

First, it aims to stimulate both invention and the assiduous search for new applications of knowledge, which is the basis of invention. It does this by placing the inventor in a position to secure a reward.

Second, it seeks to create conditions whereby the venture of funds to finance the hazardous introduction into public use of new devices or processes will be warranted. This is done by protecting the industrial pioneer for a limited time against the uncontrolled competition of those who have not taken the initial financial risk.

Third, it aims to prevent the creation of an industry permeated by the intense secrecy with regard to its processes which characterized the medieval guilds and which can only retard the realization by the public of the benefits of scientific progress. This it does by extending a temporary monopoly to those who, in keeping with the American ideal of openness and frankness, will make a full disclosure of their new ideas so that they may be utilized to the full by those skilled in a particular art.

\* \* \* \* \* \*

It worked well. This country has prospered beyond all others in the wide application of new techniques and in advanced industrial processes. Undoubtedly much of this was due to the width of the land in which great homogeneous markets were developed, and to the pioneering spirit of the people which could be applied as well to the industrial as to geographic frontiers. Yet the patent system was largely responsible for the vigor of our small enterprises and for the effectiveness with which new things were promptly brought into use. Life was made more comfortable, healthy, and worth living for large numbers of our citizens.[2]

The nurturing through our patent system of incentives which stimulate new developments is perhaps more important today than ever before, in view of the intense scientific and industrial competition in which our country is now engaged. In 1962 the Chairman of the Patent Subcommitte of the Senate Judiciary Committee stated:

This subcommittee is of the view that at no time in its history has the United States been faced with a greater industrial and technological challenge. The important contribution of incentive to the growth of the economy and

---

1. The complaint charges defendant with direct infringement, contributory infringement and actively inducing others to infringe.

2. Study No. 1, Subcommittee on Patents, Trademarks and Copyrights, Committee on The Judiciary, United States Senate, 84th Congress, 2nd Session (1956), pp. 1–2, footnotes omitted.

the encouragement of research has been well established. Equally well established is the role of the patent system as an incentive device * * *

In this action the court is concerned with only a few sections of the Patent Act, namely those relating to defendant's attacks against the validity of the Fain patent, and those relating to defendant's infringement of the patent and the relief sought by plaintiff.

Defendant's contention that the patent is invalid for lack of novelty—or "anticipation"—is based on the following portions of 35 U.S.C. section 102:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country * * * more than one year prior to the date of the application for patent in the United States, or

 *      *      *      *      *      *

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent * * *

Under these statutory provisions defendant is relying on one or more of the numerous items of prior art which it has cited. They consist of no less than 12 United States patents, ranging in date from 1920 to 1958, 15 publications and alleged knowledge and use by 12 individuals and corporations.

Defendant's contention that the patent is invalid for lack of invention is based on 35 U.S.C. section 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

In support of this contention defendant relies on the same prior art referred to above.

Defendant's contentions that the patent is invalid by reason of public use of the method of the patent (or sale of apparatus for practicing the method) more than one year prior to the patent application is based on the following portion of 35 U.S.C. section 102:

A person shall be entitled to a patent unless—

 *      *      *      *      *      *

(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *

This same provision is also involved in defendant's further contention that the patent is invalid for prior use of the method of the patent more than one year before disclosing and/or claiming the method in the application for the patent in suit.

Defendant's contention that the patent is invalid for improper form of specification and claims is based on these portions of 35 U.S.C. section 112:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly point-

ing out and distinctly claiming the subject matter which the applicant regards as his invention.

Defendant's contentions must, of course, be considered in connection with 35 U.S.C. section 282 which relates to burden of proof at the trial. In addition to stating, in general terms, the defenses to a suit for infringement and setting forth requirements as to pleading and notice of such defenses before trial, it specifically states:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall res on a party asserting it."

█ It is well established that the Congressionally pronounced presumption, while rebuttable in a proper case, is not lightly overthrown and that every reasonable doubt is to be resolved against the party attacking a patent's validity. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 139 F.2d 633, 640. (4th Cir. 1943).

█ The presumption of validity, and the severe burden it places on defendant, are based largely on the fact that to hold a patent invalid in an infringement action involves the overruling of a decision by an arm of a co-ordinate branch of the Government specially empowered to pass upon patentability and specially trained in the technical questions involved. Thus it is the duty of the Patent Office carefully to examine each patent application in the light of all statutory requirements for patentability and to withold issuance unless "it appears that the applicant is entitled to patent under the law" (35 U.S.C. section 131).

Section 271 of Title 35 defines patent infringement. This section reads as follows:

(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.

(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement.

Among other sections of Title 35 relating to infringement are Section 281 which states the right of a patentee to "remedy by civil action for infringement of his patent" and Sections 283 and 284 which read as follows:

§ 283. Injunction

The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

§ 284. Damages

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the

infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances. This court therefore publishes its:

## FINDINGS OF FACT

1. The cleaning of textile machinery in textile mills (particularly cotton mills) has long been recognized as a desirable practice. Over the years automatic cleaning equipment and methods had been developed for certain items of mill machinery which were relatively easy to clean, e. g., warping machines, spinning machines, et cetera. Looms, however, were always viewed as particularly difficult to clean because the yarns, by the time they were ready to be woven, contained chemicals and sizing, such as starch. Under the high humidity conditions which were universal in the weaving operation, this sizing would very often take on gluelike properties, causing the lint generated by the weaving operation to stick to any surface upon which it impinged. As a result, the textile industry found it necessary to rely primarily on manual cleaning, either by brushing or the direct application of airstreams from hand held hoses, effectively to clean the looms. Such practices were time consuming and costly and very often contributed to excessive defects in the cloth being woven.

2. The first efforts at automatic loom cleaning are attributable to American Monorail. These efforts resulted in the method and apparatus first commercially employed by Monorail in or about 1949 in which the cleaners have an indexing motion. That is, the cleaner would pass over a row of looms in a fixed orientation relative to the looms and at the end of the pass would shift orientation to a new position and then again pass over the row of the looms. Sometime in 1954 Monorail changed from the indexing method of applying cleaning air to a method employing continuous oscillation of the airstream. Sometime prior to this another manufacturer, Parks-Cramer Company, had developed loom cleaners which also used a continuously oscillating airstream.

3. In July of 1955 Mitchell S. Fain, patentee of the patent in suit, after prior efforts at solving the problem of cleaning looms, began work on the method of loom cleaning shown and described in the patent in suit. A few months thereafter, in October of 1955, the first installation of equipment for carrying out the patented method was made and successfully operated. In April of 1956 the application for the patent in suit was filed in the United States Patent Office. After an extensive and vigorous prosecution in the Patent Office, the patent issued on April 25, 1961.

4. Beginning in 1956 and continuing until the present, Grinnell has enjoyed great commercial success and widespread acceptance by the textile industry in the sale of cleaning apparatus for carrying out the method claimed in the patent in suit.

5. By the end of 1957 Monorail once more considered it desirable or necessary to again change its method of loom cleaning. The initial suggestion at this time was to use a nozzle motion which would be either parallel or angular to the direction of travel of the cleaner, but when Monorail first installed its new cleaner in a mill in 1959 the nozzle motion was rotational so that the airstream rotated in accordance with the method of the Fain patent.

## THE FAIN PATENT

6. The Fain patent describes and claims a method of cleaning looms. The method of the Fain patent, like the method of operation of the earlier oscillating cleaners, involves directing a

stream of air downwardly onto a row of looms and advancing the stream of air along the row of looms. But instead of simply oscillating the stream of air back and forth, Fain teaches rapidly rotating the stream of air continuously in one direction as the source of air is moved over and parallel to the row of looms. This rapid rotation, when conducted as described and claimed in the Fain patent, results in the airstream impinging on any given portion of the loom being cleaned as a series of sharp rapid puffs. This is the fundamental teaching of the Fain patent.

However, simply rotating the airstream is not enough to achieve the very useful results taught by Fain, which results are achieved by the rotating nozzle loom cleaning equipment sold both by Grinnell and Monorail. Thus Fain teaches and claim 1 of the patent specifies that:

(1) the airstream is directed downwardly onto the looms at an angle substantially less than 90° to the plane of the yarns and materials;

(2) the airstream is rotated continuously in one direction so that its axis generates a conical surface of revolution with the axis of the airstream always being at an angle to the plane;

(3) the airstream source is moved over and parallel to the row of looms at a rate causing the airstream to intersect the plane (of the yarns and materials) in a closely overlapping circuitous path whose configuration is substantially that of curtate cycloid;

(4) the airstream is caused to strike the plane along the path of travel of and beneath the source at least' twice, once during movement along the forward portion of its circuitous path and once during movement along the rearward portion of its circuitous path so that the airstream impinges on any given portion of the object being cleaned as a series of sharp rapid puffs having vertical and horizontal components with respect to the plane prior to the impingement.

While it proved convenient to be able to use the term "curtate cycloid", this term was not essential to a description of the invention. The words "curtate cycloid" were used in the Fain patent and its claims as a short verbal expression of the shape of the intended movement along the plane of the cloth and warp. What is meant is readily apparent from an examination on Fig. 1 of the Fain patent in connection with the descriptive language in the patent.

Claim 2 of the Fain patent differs from claim 1 essentially only in requiring the axis of rotation of the airstream to be substantially vertical.

7. In the Fain patent two rotating airstreams are shown, one for those portions of the looms on the warp side of the harness and one for those portions of the looms on the cloth side of the harness. Grinnell's commercial loom cleaners use two rotating airstreams. Monorail has sold and used loom cleaners both with two rotating airstreams and four rotating airstreams.

8. It is abundantly evident from the file history of the Fain patent that the application was subjected to rigorous examination. The numerous Patent Office Actions, Interviews and Amendments show that the Patent Office Examiners gave full and careful consideration to the case. Thus the Fain application is entitled fully to the presumption of validity accorded by the statute, 35 U.S.C. section 282, Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484, 493 (4th Cir. 1962); Manville Boiler Co. v. Columbia Boiler Co. of Pottstown, 269 F.2d 600, 604–605 (4th Cir. 1959), cert. denied 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959).

FACTS ABOUT INFRINGEMENT

9. Starting in 1956 Grinnell's rotating nozzle loom cleaners and the loom cleaning method practiced by these

cleaners became a significant factor in the loom cleaning industry. Monorail early recognized the importance of Grinnell in this field and the fact that Monorail's prior oscillating nozzle cleaners were inferior to Grinnell's rotating nozzle cleaners. Monorail determined to develop a loom cleaner which would have a "more desirable method" so that Monorail could "prove evidence to the effect that" Monorail could do a better job than Grinnell.

10. The first evidence in Monorail's intentions in this regard is its internal memorandum of November 26, 1957. This document, which was prepared by McEachern, was a formal request for development of a "new-type loom cleaner". McEachern was formerly Monorail's Southeastern Division Sales Manager and is now a Monorail Vice President. As shown in Px. 4, McEachern wanted the "new type loom cleaner", when built, shipped to South Carolina for trial "in a weave room along side an American Moistening [Grinnell] loom cleaner."

1. The Monorail development of a "new type loom cleaner" resulted in a rotating nozzle loom cleaner installed on an experimental basis in Woodside Mills, Greenville, S. C. during the summer of 1959. The nature of Monorail's Woodside Mills installation and its relationship to the Grinnell [American Moistening] cleaner is shown in McEachern's letter of September 2, 1959 to Monorail's Vice-President, Carl Harris.[3] The letter clearly demonstrates Monorail's recognition of the superiority of Grinnell's loom cleaning action and Monorail's deliberate intention to copy this action.

12. The "whirling air outlet device" which McEachern referred to as the "key to the entire piece of equipment" represents the basic difference between the loom cleaning equipment McEachern wanted to market and the previous oscillating nozzle cleaner. The American Moistening unit—which McEachern admitted that at least some customers knew was "the best unit on the market"—was Grinnell's loom cleaner which was being sold to mills by Grinnell's subsidiary American Moistening.

13. That Monorail was copying Grinnell is further demonstrated by McEachern's testimony on deposition and at the trial. In his deposition McEachern testified:

Q340: I believe that you testified that the idea for an American Monorail rotating nozzle loom cleaner was essentially yours?

A: Yes.

Q341: Where did you get the idea of a rotating nozzle?

A: From seeing American Moistening's.

14. All of Monorail's rotating nozzle loom cleaners, as actually used in the mills, carry out a method which is exactly the method specified in claim 1 of the Fain patent.

15. The correspondence between claim 1 of the Fain patent and the cleaning

3. The McEachern letter states, in part: The past several weeks with our new type loom cleaner at Woodside Mills in Greenville has convinced me more than ever that we are definitely on the right track to a very effective piece of loom cleaning equipment, which I think will do a better job than anything on the market today. I do not think it is a gamble to go full speed ahead with this particular type loom cleaner and as I have brought out many times before, the whirling air outlet device is the key to the entire piece of equipment and I think F. C. Harris now has enough insight into the problem and enough ideas on how to build this piece of equipment than [sic] we can be reasonably sure we are extremely close to a final salable operating design.

Our competition [reference is to Grinnell] has made giant strides in the last year and it is most necessary that we do everything possible to get not only the installations in and operating that hage [sic] been sold but to get a number of trial installations in and running. Several locations have been reported to me where the customer is definitely going to buy loom cleaning, knows that American Moistening has the best unit on the market, and will not consider American Mono-Rail unless we can prove evidence to the effect that we can do a better job than they can.

method practiced by Monorail's rotating nozzle loom cleaners is clearly shown by McEachern's testimony on deposition. McEachern testified about a Monorail rotating nozzle loom cleaner installation at the Upper Pelzer Plant of Kendall Company at Pelzer, South Carolina. McEachern's testimony shows that the method of loom cleaning practiced at the Upper Pelzer Plant through use of the Monorail rotating nozzle loom cleaners corresponded in every respect with the method specified in claim 1 of the Fain patent.

16. Grinnell's expert witness, Professor C. M. Asbill, head of the Department of Textile Machine Design at the School of Textiles of North Carolina State University, also testified about the Upper Pelzer installation. The testimony of Professor Asbill clearly shows that the Monorail rotating nozzle loom cleaner installation at Upper Pelzer infringed claim 1 of the Fain patent in that the method of loom cleaning practiced by the Monorail loom cleaners corresponded in every particular with the method steps of claim 1 of the Fain patent. McEachern's testimony further shows that what he said about the Upper Pelzer installation was applicable to all of Monorail's rotating nozzle loom cleaner installations.

17. Claim 2 of the Fain patent differs slightly from claim 1. Thus claim 2 requires that the angle of the airstream be maintained constant with respect to the plane of the yarns and materials. In other words, the nozzle which produces the airstream must rotate about a vertical axis. The record shows that in at least one instance after the issuance of the Fain patent Monorail used a rotating nozzle loom cleaner having a nozzle which rotated about a vertical axis and thus carried out not only the method of claim 1, but also carried out the method of claim 2 of the Fain patent. This instance was a trial installation made at the J. P. Stevens and Company plant at Piedmont, South Carolina.

18. In attempting to sell loom cleaner installations it is customary for Monorail to make trial installations in the prospective customer's weave room. The installation is owned, operated and adjusted by Monorail and may be removed by Monorail at the end of the trial period. A typical example of such a trial installation was the one, referred to above, at the J. P. Stevens and Company, Piedmont, South Carolina plant.

19. Monorail's operation of rotating nozzle loom cleaner installations owned by it constitutes direct infringement of the Fain patent under 35 U.S.C. section 271(a) which requires, for a holding of direct infringement, the use, without authority, of a patented invention within the United States during the term of the patent.

20. The record shows that Monorail has actually induced infringement of the Fain patent by soliciting orders for the installation of cleaning equipment which, when operated, carries out the method of the patent, and by making installations in a customer's weave room so as to carry out the claimed method. Moreover, Monorail periodically services and adjusts the equipment for the customer so that the equipment will operate in accordance with the claimed method.

These acts of Monorail, considered in the light of actual infringement of the Fain patent by Monorail's customers, constitute active inducement of infringement under 35 U.S.C. section 271(b) and therefore Monorail is also liable as an infringer under section 271(b). Fromberg, Inc. v. Thornhill, 315 F.2d 407, 411–412 (5th Cir. 1963); Metallizing Engineering Co. v. Metallizing Co., 62 F.Supp. 274 (S.D.N.Y.1945).

21. The rotating nozzle loom cleaners sold by Monorail as part of its loom cleaner system installations are not themselves direct infringements of the Fain patent. However, their use is. While Monorail's rotating nozzle loom cleaners do not necesarily have to be operated so as to practice the method of the Fain patent, as a practical matter this apparatus would have no substan-

tial use except in the practice of that method. Further, Monorail instructs the mill personnel to operate the equipment to carry out that method. Thus it is clear that the sale by Monorail of its rotating nozzle loom cleaners constitutes contributory infringement of the Fain patent within the meaning of 35 U.S.C. section 271(c). The character of Monorail's activities is very similar to that condemned in Rohm & Haas Company v. Roberts Chemicals, 245 F.2d 693, 699 (4th Cir. 1957) or in Hall v. Montgomery Ward & Co., 57 F.Supp. 430, 437–438 (N.D.W.Va.1944).

22. At the oral argument Monorail's counsel urged that the claims of the Fain patent should be limited by implication to speeds of rotation of six hundred revolutions per minute or higher. There is no reasonable basis in the patent or in its prosecution file for such a limitation. Infringement of the claims of the Fain patent is not based on any particular number of revolutions per minute but on satisfying the requirements set forth in the claims.[4]

## VALIDITY

23. The Fain patent represents a new, valuable and unobvious contribution of that type which our patent system was designed to foster and protect, and Monorail's contentions to the contrary are unsound. Under 35 U.S.C. section 282 a patent is to be presumed valid.

24. It is well established that the Congressionally pronounced presumption, while rebuttable in a proper case, is not lightly overthrown. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 139 F.2d 633, 640 (4th Cir. 1943). As was pointed out in King-Seeley Thermos Co. v. Re-

frigerated Dispensers, Inc., 354 F.2d 533, 536 (10th Cir. 1965):

It is elementary patent law that a regularly issued patent is presumed valid, and a party asserting invalidity has the burden of establishing such invalidity by clear and convincing evidence.

■ 25. It is the duty of the Patent Office carefully to examine each patent application in the light of all statutory requirements for patentability and to withhold issuance unless "it appears that the applicant is entitled to a patent under the law" (35 U.S.C. § 131). The duty and responsibility of the Patent Office in this regard was emphasized by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 15 L. Ed.2d 545 (1966).[5] And while the Supreme Court recognized that the Patent Office does not always meet this responsibility, the extensive and detailed prosecution history of the Fain application shows that in this case the Patent Office did fully perform its duty and meet its responsibility. Monorail, in its pleadings, contended that the Fain patent was invalid by reason of anticipation (35 U.S.C. § 102) and for lack of invention (35 U.S.C. § 103).

26. Before the trial Monorail cited as prior art in support of its defense of invalidity no less than 12 United States patents, ranging in date from 1920 to 1958, 15 publications and alleged knowledge and use by 12 individuals and corporations. At the trial Monorail presented testimony relating to six patents and introduced colored exhibits purporting to show some correlation between the six patents and the claims of the Fain

---

4. The requirements of the claims of the Fain patent as regards speed of rotation are (1) that the airstream intersect the plane of the yarns and materials in a closely overlapping circuitous path which is substantially that of a curtate cycloid; (2) that the airstream strike a point on the plane at least twice, once during movement along the forward portion of its circuitous path and once during movement along the rearward portion of its

circuitous path; and (3) that the airstream impinge on any given portion of the object being cleaned as a series of sharp rapid puffs.

5. While we have focused attention on the appropriate standard to be applied by the courts, it must be remembered that the primary responsibility for sifting out unpatentable material lies in the Patent Office. (p. 18).

patent. The six patents are the following:

Farrell ....................1,339,182
Wheller ....................2,000,112
Holtzclaw ..................2,635,275
Holtzclaw ..................2,695,039
Miller .....................2,798,825
King .......................2,845,303

In its main brief after trial Monorail narrowed the prior art it relied upon to two patents, King and Holtzclaw 2,635,-275. In its reply brief and at the oral argument Monorail relied entirely on the King patent. Monorail's contention is that "the inherent and normal operation of the prior art nozzle of King 2,845,303 by a mechanic skilled in the art will produce the identical method set forth in claim 1 and the method of claim 2 with only slight variation."

27. The King patent is directed to an air nozzle for cleaning lint from textile machinery, ceilings and walls and is one of the prior art patents cited by the Examiner in the Fain application. There is nothing in the King patent that suggests that the King nozzle could or should be used in a manner that would carry out the claimed Fain method. In his testimony at the trial, Professor Asbill described the mechanical deficiencies of the King construction and explained why it could never be used at speeds high enough to carry out the Fain patented method.

28. Monorail argues that the nozzle of the King patent, if suitably mounted above a row of looms, if advanced at a lineal speed of 80 feet per minute and if rotated at 14½ revolutions per minute would produce an airstream whose axis described a curtate cycloid. Even if it be assumed that this is the case, there is no teaching in the King patent which would suggest to a man skilled in the art that it should be done. And even if it were done, there would still not be a practice of the method claimed in the Fain patent which requires, for example, that the airstream be rotated so that it intersects the plane of the cloth or warp in a closely overlapping circuitous path,

that the airstream substantially strikes a point on the plane at least twice, once during movement along the forward portion of its circuitous path and once during movement along the rearward portion of the path so that the airstream impinges on any portion of the object being cleaned as a series of sharp rapid puffs.

29. It is clear from the Patent Office prosecution file of the Fain patent that the Patent Office Examiner carefully analyzed the King patent and understood what it taught and what it did not teach. And the Examiner correctly concluded that the normal operation of the King nozzle by a mechanic skilled in the art would not perform the Fain method. The Patent Office Examiner also concluded that a combination of a rotating nozzle, e. g., the one of the Wheller patent 2,000,112, did not teach the Fain method and he allowed the Fain claims. This is significant in view of the fact that Monorail also urges that the Fain patent is invalid in view of a suggested modification of King and Holtzclaw '275. For this purpose there is no real difference between the rotating heater nozzle of Wheller, which the Examiner combined with King, and the rotating ceiling cleaner of Holtzclaw '275, which Monorail seeks to combine with King.

30. The action of the Patent Office Examiner in allowing the Fain claims—with a full recognition of the King teachings and after a full consideration of the possibility of substituting a rotating nozzle for the King nozzle—demonstrates that Monorail's present argument is unsound. The Examiner's determination in this regard is entitled to great weight. Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484, 493 (4th Cir. 1962); Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 35 F.2d 433, 437 (4th Cir. 1929). In the Power Curbers case the Court quoted with approval from one of its earlier decisions:

In Chesapeake & O. Ry. Co. v. Kaltenbach, 95 F.2d 801, 804 (4th Cir. 1938), this court held: '* * * [T]he presumption of validity is strengthened

where, as here, the principal references urged against the patent have been considered by the Patent Office.'

The commercial success achieved by Grinnell in the sale of its loom cleaning systems, and the activities of Monorail in copying the Fain method aid in showing that the Fain patent claims "are imbued with the quality and attributes of invention." Briggs v. M. & J. Diesel Locomotive Filter Corp., 342 F.2d 573, 580 (7th Cir. 1965)[6], cert. denied 382 U.S. 801, 86 S.Ct. 11, 15 L.Ed.2d 55 (1965).

31. Turning now to Monorail's other argument that the Fain patent is void for indefiniteness in that it does not teach enough to "enable the mechanic skilled in the art to produce the invention," this argument is obviously inconsistent with Monorail's argument with respect to the King patent. If (as Monorail contends) a person skilled in the art would inherently operate the King device in accordance with the Fain method, then just as inherently a person skilled in the art would so operate the device shown in the Fain patent. Indeed, Monorail went so far at an early stage of this case as to prosecute a motion for summary judgment predicated on the proposition that the Fain method was the inherent operation of the device of the Fain patent. That motion was denied by Judge Martin. Monorail's counsel now urges that Monorail "was in error" in seeking a summary judgment predicated on that theory.

32. Under 35 U.S.C. section 112, the Fain patent specification is required to teach a person skilled in the art how to practice the method and the claims are required to define that method. This the patent has done. And there is no basis in the record for concluding that Monorail—or anyone else skilled in the loom cleaning art—would have any difficulty in using the teachings of the Fain patent to practice the Fain loom cleaning method.

33. Monorail argues that the Fain patent should have specified the length of the nozzle. The patent provides that the nozzle be:

\* \* \* of such length that substantially every part of the moving air entering the nozzle from the duct has its direction changed to a new direction at an angle to the axis 108. If the nozzle 96 is of sufficient length this new direction may be parallel to the nozzle axis 112. For short nozzles the new direction may form a somewhat smaller angle with the duct axis 112, for example, along the line 112a (See Fig. 1). Col. 4, 11. 42–49)

This, coupled with the showing in the patent drawings, is a sufficient teaching of nozzle length to enable a man skilled in the art to practice the Fain invention. The Fain method has been practiced successfully with a variety of nozzle lengths and heights above the looms.

34. Monorail also contends that the Fain patent "teaching is also lacking as to proper speeds of rotation," linear speeds, air velocities, volumes, angle of air impingement, height of the nozzle above the loom, size of the air pattern and coordination of the many variables. The speed of rotation is aptly defined in the Fain patent, e. g., in the requirements of the claims (1) that the airstream intersect the plane of the yarns and materials in a closely overlapping circuitous path which is substantially that of a curtate cycloid; (2) that the airstream strike a point on the plane at least twice, once during movement along the forward portion of its circuitous path and once during movement along the rearward portion of its circuitous path; and (3) that the airstream impinge on any given portion of the object being cleaned as a series of sharp rapid puffs.

6. The District Court's conclusion that the patent claims in suit are imbued with the quality and attributes of invention is reinforced by the commercial success attained by the plaintiffs' commercial structure and the activities of the defendants which followed. (342 F.2d p. 580).

35. As to the other variables, the teachings of the Fain patent, when applied by one having ordinary skill in the art, are fully adequate to permit practice of the invention. Briggs v. M. & J. Diesel Locomotive Filter Corp., 342 F.2d 573, 578 (7th Cir. 1965),[7] cert. denied 382 U.S. 801, 86 S.Ct. 11, 15 L.Ed.2d 55 (1965). In this regard the teachings of Monorail's Miller and Becker patent 2,729,845, which issued before the Fain application was filed, show the art necessary or suitable ranges of some of the variables. That the Miller and Becker teachings are applicable to the Fain patent is demonstrated by the fact that Monorail, in 1958, brought suit charging use of the Fain loom cleaners to be infringements of Monorail's patent.

36. Prior to the trial of this case Grinnell made available to Monorail, for test purposes, a commercial model Grinnell loom cleaner. That loom cleaner was subjected to a number of *ex parte* tests by Monorail's expert witness, Mr. George Hobbs. The tests conducted by Mr. Hobbs involved measurement of the velocity of the airstream at a distance from the nozzle corresponding to the plane of the warp or yarn on a loom. And Mr. Hobbs prepared some drawings (Dx. 48A–48D) purporting to show graphically the results of his findings. In essence, what Mr. Hobbs tried to show was that the Grinnell loom cleaner which he tested would not carry out the method claimed in the Fain patent. This effort was intended to support Monorail's contention that the Fain patent failed properly to describe and claim the invention as required by 35 U.S.C. section 112. Mr. Hobbs' tests do nothing of the sort.

37. Mr. Hobbs' tests all involved measurement of the airstream velocity. For this purpose he used an instrument known as an Alnor velometer. This instrument is inherently sluggish—it takes appreciable time for the instrument reading to ·reflect the air velocity which it senses. As a result, when the instrument is used—as it was by Mr. Hobbs—to measure puffs of air from a nozzle rotating at 600 revolutions per minute, the readings become meaningless. The virtual uselessness of the Alnor velometer for measuring the velocity of puffs of air is clearly shown by the testimony of Professor Asbill and by a demonstration conducted in Court by Professor Asbill.

38. Even if the Hobbs tests were taken at face value, they do not demonstrate that the Fain patent is invalid. The most that they could be said to show was that the loom cleaner on which Mr. Hobbs ran his tests was not as good as it might have been in carrying out the ·Fain method. This Grinnell loom cleaner differed from the original model installed at Wamsutta Mills in 1955 and from later commercial models. It is not material to this case whether this intermediate model was better or worse at carrying out the Fain method than the earlier or later models. What is material is that the

---

7. We have had occasion to observe that patent claims and specifications are addressed to those skilled in the art. In Binks Manufacturing Company v. Ransburg Electro-Coating Corporation, 7 Cir., 281 F.2d 252, 256–257, this Court stated:

We find no merit in plaintiff's contention that the method claims fail to satisfy the requirements of the patent statute (35 U.S.C.A. § 112) because they merely cite a desired result rather than the means for producing the same, and because of incompleteness due to failure to specify voltages, spacing, and liquids to which they are applicable. The process claims define the specific steps of procedure and the specifications being addressed to those skilled in the art

(Highway Appliances Co. v. American Concrete Expansion Joint Co., 7 Cir., 93 F.2d 113) need not recite details. * * *

* * * * *

There is no requirement that quantitative values for such factors as voltage, spacing and liquid characteristics be recited. The fact that experimentation or the exercise of judgment is necessary to adapt a patented process to particular material or to obtain the particular results desired does not impair validity of the patent. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 139 F.2d 633, 638–639. (p. 578).

Monorail rotating nozzle loom cleaner did use the Fain method.

39. That the Grinnell loom cleaner used by Mr. Hobbs did carry out the Fain method was shown to the court in a demonstration conducted by Monorail during the trial at Highland Park Mills, Rock Hill, South Carolina. In this demonstration the loom cleaner was suspended above Mr. Hobbs' test table at a typical height. The Grinnell cleaner delivered a series of sharp rapid puffs having horizontal and vertical components, and if the cleaner had been moved over a row of looms as described in the Fain patent any given portion would have been subjected to a series of sharp rapid puffs. To the extent that there may have been air hitting a point on the test table vertically, such vertical air was outside of the cleaning or central portion of the airstream and would, if the loom cleaner had been advancing over a row of looms, contact that point between puffs of air as the loom cleaner advanced linearly. In other words, as the cleaner advanced over the row of looms, any selected point would receive one or more puffs of air as the cleaner approached the point, then perhaps some vertical air as the cleaner passed directly over the point and then one or more puffs of air as the cleaner passed on beyond the point.

## CONCLUSIONS OF LAW

A. The Court has jurisdiction of the subject matter and parties to this suit.

B. Plaintiff is the owner of the patent in suit, Fain patent 2,981,644, and all rights of recovery thereunder.

C. The patent in suit is not anticipated by any of the prior patents or publications which have been introduced in evidence or by the activities of any of the persons or corporations referred to in defendant's notices under 35 U.S.C. section 282 as to which evidence was introduced.

D. The subject matter of the patent in suit was not obvious to those skilled in the art, at the time the invention was made by the patentee, Mitchell S. Fain; on the contrary, his invention represented an important and patentable contribution to the loom cleaning art.

E. The subject matter of the patent in suit has been an outstanding commercial success.

F. The specification and claims of the patent in suit comply with the requirements of 35 U.S.C. section 112.

G. The patent in suit is valid as to both claims thereof.

H. Defendant has itself infringed both claims of the patent in suit by itself practicing the claimed method in the operation of defendant's rotating nozzle loom cleaners.

I. Defendant has induced others to infringe the patent in suit, as to claim 1 thereof, by its solicitation, sales, installation and maintenance, to and for customers, of rotating nozzle loom cleaning systems which operate to carry out the method of the patent in suit.

J. Defendant has contributed to the infringement of the patent in suit, as to claim 1 thereof, by its sale of rotating nozzle loom cleaner systems for use in practicing the patented process of the patent in suit, which is a material part of the invention, with knowledge that the systems are especially made or especially adapted for use in infringement of the patent in suit, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

K. Defendant's infringement of the patent in suit has been deliberate and willful.

L. Defendant's counterclaim should be dismissed.

M. Plaintiff is entitled to judgment, enjoining defendant, its officers, servants, agents and those in privity with it from any further infringement of Letters Patent No. 2,981,644, and to an accounting to determine the amount of damages to which plaintiff is entitled as the result of defendant's past infringement.

N. Plaintiff shall recover its costs in this action.

And it is so ordered.